Frank L. Robinson, appellee, v. Dawson County Irrigation Company, appellant: Elmcreek Ditch Company, appellee.

15 N. W. 2d 231

Filed July 14, 1944. No. 31792.

*Lyman M. Stuckey, W. A. Stewart, Jr.,* and *H. L. Blackledge,* for appellant.

*Dryden & Jensen, contra.*

Heard before Simmons, C. J., Paine, Messmore, Yeager, Chappell and Wenke, JJ.

Paine, J.

This is the second appeal in an action filed January 31, 1941, by Frank L. Robinson, plaintiff, against the Dawson County Irrigation Company and the Elmcreek Ditch Company, defendants, to restrain them from appropriating, or converting to their own use, the natural flow of the Platte river, or storage water from the Sutherland dam, and to recover damages to growing crops in the sum of $6,026. Upon the first trial of the case, plaintiff waived his right to an injunction, and the trial proceeded as one for damages. The jury returned a verdict for $3,125, upon which a judgment was entered, and the defendants appealed.

This court entered an opinion, written by Judge Carter, upon such first appeal, which is found in 142 Neb. 811, 8 N. W. 2d 179, and in that opinion will be found a rather complete statement of the pleadings, which will not be repeated here, as the second trial was upon the same pleadings, with certain amendments allowed by the court. There was also in that opinion a summary of the evidence as presented at the first trial.

It was held in that first opinion that "the case is one in

which a court of equity could properly take jurisdiction, and jurisdiction once having been taken, the case will be retained for the adjudication of all issues. No objection was made to the court's calling of a jury. The mere fact that the trial court failed to grant an injunction does not deprive such court from hearing the prayer for damages for the injuries suffered. The verdict of the jury must, therefore, be treated as advisory in character and the presumption follows that any errors in the submission of the case to the jury were considered by the trial court before judgment was entered."

The judgment was reversed in this court upon the ground that the evidence introduced made no distinction between the natural flow and storage waters, "and the cause remanded for a new trial on the question of the wrongful conversion of the storage water in which plaintiff had a beneficial use and the resulting damages, if any, sustained by the plaintiff."

The fourth paragraph of the syllabus in our former opinion reads as follows: "Where evidence of damage to growing crops resulting from the unlawful conversion of storage water is so commingled with evidence of alleged damage resulting from the taking of the natural flow of the stream to which defendant was entitled that the one cannot be separated from the other and the damage caused by each cannot be ascertained, the judgment cannot be said to be supported by the evidence."

A retrial was had in the district court, without a jury, beginning on June 28, 1943. The case was taken under advisement, briefs were submitted, and on January 17, 1944, a judgment was entered against each of the defendants for damages resulting from the wrongful conversion of storage water and the wrongful appropriation of the same between July 24, 1940, and August 9, 1940, in the amount of $2,000, upon which judgment a credit was allowed of $117.70 for costs incurred in the first appeal, which had been reversed by our former opinion.

It will be seen that the cause was remanded because the

evidence at the first trial commingled the natural flow of water in the Platte river and the amount of the flow in that river arising from the storage water released at the North Platte dam of the Platte Valley Public Power and Irrigation District, hereinafter called the Sutherland district.

At the second trial a number of amendments were made to the petition, and a large amount of evidence was taken which was before the court for the first time. The questions now presented on this second appeal must be determined from the evidence in the present bill of exceptions, and not from any previous findings of this court, which of necessity were based only upon the evidence which was then found in that record.

The errors now relied upon for reversal, as set out in the brief of the only appealing defendant, the Dawson County Irrigation Company, hereinafter called the Dawson company, are as follows: That the judgment is not sustained by, and is contrary to, the evidence; that the court erred in allowing the plaintiff to introduce evidence pertaining to natural flow of water, and that the amount of the damages is excessive. In its brief the defendant states: "The case was again tried to the court on the sole issue as to whether or not defendants converted any storage waters belonging to the plaintiff by virtue of his interest in the Kearney Mutual Irrigation Company."

The evidence discloses that the plaintiff is a farmer and stock raiser, who has lived in Buffalo county for 33 years, and owned or operated some 2,000 acres of land, most of it lying about three miles west of Kearney, the map, exhibit No. 20, showing that it was located on both sides of the main line of the Union Pacific railroad; that he had contracted 250 acres of his land for irrigation in 1940 with the Kearney Mutual Irrigation Company, which company had a total of 913 acres under irrigation for that year, the plaintiff's land composing over 25 per cent of its acreage for 1940.

This Kearney company had a contract with the Central

Power Company for the delivery of water to its irrigators. The Central Power Company had a priority on Platte river water as of September 10, 1882, of 22 second feet appropriation for irrigation purposes. Such priority was superior to the rights of either defendant irrigation company.

By virtue of a contract, exhibit No. 4, with the Sutherland district, the Kearney company was entitled to the delivery of a certain amount of storage water from the Sutherland dam. Such water was released just below the city of North Platte into the Platte river.

It appeared that the Dawson company had constructed a dike across the Platte river at its headgates, by which it diverted all the water coming down the Platte river into its headgates, and had then secured from the county judge of Dawson county a restraining order, and later an injunction from the district court for Dawson county, restraining the bureau of irrigation, water power and drainage of the state of Nebraska from closing the headgates of the said Dawson company, and by virtue of such injunction the headgates were kept open, so no storage water could go down the Platte river to the Kearney company, but all such water passed into the canal of the Dawson company.

In a letter, exhibit No. 16, from R. H. Willis, chief of the state bureau of irrigation, water power and drainage, under date of December 13, 1940, to R. F. Stuckey, president of defendant Dawson company, Mr. Willis said that 37,680 acre feet of water passed through the rating flume of the Dawson company between May 1, 1940, and September 30, 1940, of which amount 24,716 acre feet were natural flow and the balance was storage water. Mr. Willis then writes:

"As a routine matter Mr. Hervert, Senior Hydrographer in the employ of the state, has standing instructions to measure all of the river flow in that section, tributary inflows, diversions, etc. Mr. Messmer, Hydrographer in the employ of the Platte Valley Public Power and Irrigation District, coordinated with Mr. Hervert in this work which seemed proper in view of the fact that the Platte Valley Public Power and Irrigation District was disposing of stor-

age water and was keenly interested in knowing about its disposal."

Exhibit No. 2 shows the daily diversion at the Dawson county canal for the month of July, 1940, of both the amount of natural flow and also of storage water, amounting for that month to 2,238 natural flow and 4,252 storage water, and exhibit No. 3 is for the first 20 days in August, 1940, showing there was 3,660 natural flow and 6,536 storage water going into the Dawson canal.

Horace J. Cary, a director of the Sutherland district since 1933, testified that the Kearney company ordered 25 second feet of water on July 19, 1940, from the Sutherland district, and the official answered from North Platte that 200 second feet were at once discharged at the tailrace to supply Kearney with 25 second feet and Elm Creek with 30 second feet of water. This water was to be delivered down the Platte river, but because of the Dawson company dike and its headgates being left open, and the injunction forbidding their being closed, it resulted in all of the storage water sent down from North Platte going into the Dawson company's canal.

R. H. Willis testified: "I doubt that 200 second feet would any more than deliver 25 second feet at the headgate of the Kearney canal by way of the river bed."

Each day's flow, on exhibits Nos. 2 and 3, was inquired about separately of R. H. Willis, and he testified that, with this amount of storage water going into the Dawson canal headgates each day, 25 second feet of that water could have been delivered to the Kearney company daily from July 24 to August 9, inclusive.

Mr. Mesmer testified from the records, as found in exhibits Nos. 2 and 3, that a sufficient amount of storage water was released at the dam, and which went into Dawson canal, to have delivered 25 second feet to Kearney over the period July 24 to August 9, 1940. He also testified that the Kearney canal irrigators could have secured 800 acre feet over the period from July 25 to August 9, 1940, and would have been able to irrigate. He testified that water as it

flows is just water, but by mathematical computation he can arrive at the figure as to how much of it is storage and how much of it is natural flow.

Mr. Balcom, manager of the Kearney canal for over 18 years, who has served in several capacities, testified from the exhibits that from July 25, 1940, up into August all the flow in the Kearney canal was natural water flow, and that no storage water came into the canal.

R. H. Willis, with the exhibits in front of him, testified that the Kearney canal was a wet ditch, which means it can deliver more water for irrigation purposes than if it was dry to start with, and that from the period July 24, 1940, to August 12, 1940, inclusive, if the Kearney canal had received 25 second feet of storage water its irrigators on 961 acres would have been able to irrigate continuously through the season. He testified that 25 second feet of water equals 50 acre feet every 24 hours.

We therefore conclude that the engineers kept accurate records; they show us how much storage water they put in the river at North Platte. The records also take into consideration the natural seepage and other natural water along with the storage water, and show the true facts for each day in their daily bulletin.

These records show us how much water the Dawson canal received, and they used all of this storage and natural water that they could, and dumped what they could not use into Elm Creek, and from July 25 on the Kearney canal got almost nothing,—for unless there was 25 feet of water running in that canal no one could use it, for without a sufficient head one cannot irrigate.

Kearney was to get 25 second feet of water at its intake, and the release of 200 feet of storage water at North Platte would give Kearney that amount, but the defendants took all of this storage water released for Kearney.

It appears from the evidence that, if this water had not been converted by the two defendant irrigation companies, the plaintiff would have received sufficient storage water to have irrigated all his crops, whereas he was unable to irri-

gate at all during the critical period from July 20 to August 9, 1940, and hence suffered the loss to his crops.

This being an equity case, section 20-1925, Comp. St. 1929, requires this court to try the case *de novo* and reach an independent conclusion as to the findings of fact and of the law. See *Peterson v. Winkelmann,* 114 Neb. 714, 209 N. W. 499; *Graham Ice Cream Co. v. Petros,* 127 Neb. 172, 254 N. W. 869; *Batth v. Metropolitan Life Ins. Co.,* 137 Neb. 676, 290 N. W. 902; *Neary v. General American Life Ins. Co.,* 140 Neb. 756, 1 N. W. 2d 908.

"Where all defendants are materially interested, although concert is lacking, and separate and independent acts of negligence combine to produce injury, each defendant so involved is responsible therefor." *Hagadone v. Dawson County Irrigation Co.,* 136 Neb. 258, 285 N. W. 600.

"An act wrongfully done by the joint agency or co-operation of several persons, or done contemporaneously by them without concert, renders them liable jointly and severally." *Schweppe v. Uhl,* 97 Neb. 328, 149 N. W. 789. See, also, *Bosteder v. Duling,* 115 Neb. 557, 213 N. W. 809; *O'Neill v. Rovatsos,* 114 Neb. 142, 206 N. W. 752; *Dickinson v. Lawson,* 125 Neb. 646, 251 N. W. 656; *First Trust Co. v. Carlsen,* 129 Neb. 118, 261 N. W. 333.

In the case at bar, the same trial judge tried the case twice, and had the opportunity of observing the many witnesses who testified orally, and is presumed to have rejected and disregarded all incompetent and improper proof, and decided that the evidence clearly supported a judgment of $2,000 for the plaintiff.

We have discussed the only errors argued in the defendant's brief, and have reached the conclusion that there is sufficient competent evidence to support the judgment rendered.

AFFIRMED.