**Wesley PETZNICK and Commercial Union Insurance Company, Plaintiffs,**

v.

**UNITED STATES of America, Defendant and Third-Party Plaintiff,**

v.

**OK ELECTRIC COMPANY, INC., Third-Party Defendant.**

No. CV 81–0–277.

United States District Court,
D. Nebraska.

Dec. 5, 1983.

700

Robert A. Skochdopole, William M. Lamson, Jr., Patricia A. Zieg, Omaha, Neb., for plaintiff Wesley Petznick.

Richard E. O'Toole, Omaha, Neb., for plaintiff Commercial Union Ins. Co.

Paul J. Johns, Omaha, Neb., for defendant and third-party plaintiff U.S.

Milton A. Katskee, Omaha, Neb., for third-party defendant OK Elec. Co., Inc.

BEAM, District Judge.

In this action under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b) and 2671 *et seq.* (the Act), plaintiff, Wesley Petznick, seeks damages for injuries sustained on May 26, 1979, while he was working on high voltage electrical transmission lines on the premises of Offutt Air Force Base, Omaha, Nebraska. Plaintiff, a journeyman electrician, was employed by OK Electric Company, Inc. (OK Electric), a party to contract number F25600-78-C0045 with the United States Air Force. The contract required OK Electric to replace certain switchgear in Building 304, the main electrical substation at the base, in connection with Offutt Project Number 77-0069.

*Negligence of the United States*

Under sections 2672 and 2674 of the Federal Tort Claims Act, the "United States shall be liable ... in the same manner and to the same extent as a private individual under like circumstances" for injury "caused by the negligent or wrongful act or omission of any employee" of a federal agency. Liability arises "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. §§ 1346(b), 2672.

Thus, the tort liability of the United States is determined with reference to the law of the state in which the allegedly tortious conduct occurred, in this case Nebraska. *Garber v. United States*, 578 F.2d 414, 415 (D.C.Cir.1978); *Bowen v. United States*, 570 F.2d 1311, 1315–17 (7th Cir. 1978). Similarly, the manner in which state law treats defenses such as contributory or comparative negligence is also incorporated into the determination of liability under the Act. *Bowen*, 570 F.2d at 1319–20; *McCormick v. United States*, 539 F.Supp. 1179, 1182 (D.Colo.1982); *Insurance Co. of North America v. United States*, 527 F.Supp. 962, 967 (E.D.Ark.1981).

Plaintiff was injured when he and a coworker were engaged in stringing a new span of wires between poles 7–2 and 7–145 of the Offutt Air Force Base electrical system. He incurred serious electrical burns, loss of limb and permanent disability as the

result of the passage of electrical current from an overhead span of wires through a jumper cable, plaintiff's body, an uninsulated bucket in which he was working, to the ground. Plaintiff argues that his inadvertent contact with the electrical current was proximately caused by the negligence of the United States.

Plaintiff's many specifications of negligence may be condensed to three major allegations of negligent conduct by the United States. He charges that the defendant: (1) failed to de-energize the power lines on and near plaintiff's work area; (2) failed to supervise the work adequately, specifically by failing to implement or to require the implementation of appropriate safety measures and procedures for the protection of business invitees performing hazardous activity on government premises, and (3) failed to install certain safety equipment, specifically a ground fault circuit interrupter.

Defendant has denied any negligence and raises a number of affirmative defenses. First, defendant contends that it was performing a discretionary function, for which it may not be sued, in permitting plaintiff to work on energized lines, in determining the degree of supervision to exercise over employees of OK Electric and in declining to install a ground fault circuit interrupter. *See* 28 U.S.C. § 2680(a). Under section 2680(a), the United States has retained its sovereign immunity from liability based on the negligent "exercise or performance or the failure to exercise or perform a discretionary function or duty."

■ The essence of a discretionary function involves the formulation of governmental policy, i.e., the making of executive and administrative decisions at a planning rather than an operational level. Thus, the United States does not enjoy immunity from liability for the want of due care by its personnel in the implementation at the operational level of policy choices previously made, often by others. *Dalehite v. United States*, 346 U.S. 15, 26–36, 73 S.Ct. 956, 963–68, 97 L.Ed. 1427 (1953); *Madison v. United States*, 679 F.2d 736, 738–41 (8th

Cir.1982); *Lakeland R–3 School Dist. v. United States*, 546 F.Supp. 1039, 1042–43 (W.D.Mo.1982).

Under this analysis, the award of a government contract to an allegedly inappropriate contractor and the promulgation of safety regulations to govern work by contractors have been considered planning level acts reflecting policy decisions immune from judicial review. *Madison*, 679 F.2d at 739–41. On the other hand, the failure to enforce a contractor's compliance with such safety rules has been regarded as operational level conduct for which the United States may be sued. *Id. See also, Allnut v. United States*, 498 F.Supp. 832, 835–38 (W.D.Mo.1980).

In the present case, certain policies of the United States Air Force with respect to the performance of electrical work at Offutt Air Force Base are defined in Air Force Pamphlet No. 85–1, "Electrical Facilities Safe Practices Handbook" and the "SAC Supplement 1" (AFP 85–1 and SAC Supplement). Plaintiff does not challenge the sufficiency of the safety standards embodied therein, but urges that the manner in which the United States permitted the work to proceed violated the policies prescribed by AFP 85–1 and the SAC Supplement.

The Eighth Circuit has previously decided that the discretionary function exception does not apply to "allegations that government employees ignored or failed to comply with regulations or policies designed to guide their actions in the particular situation." *Bergmann v. United States*, 689 F.2d 789, 792 (8th Cir.1982) and cases cited therein. More specifically, the Court has ruled that the failure of the United States to require an independent contractor to conduct inherently dangerous or ultrahazardous activity in compliance with applicable safety precautions amounts to operational level decision-making which is not immune from suit under the Act. *Madison*, 679 F.2d at 740–41.

■ The Court finds, therefore, that the Offutt Air Force Base Electrical Superin-

tendent was not formulating policy when he decided to allow the work to be performed on energized lines in this case. The same is true for the degree of supervision actually exercised by Air Force officials over the manner in which the work was performed, including the failure to implement the previously prescribed safety measures. As to these allegations of negligence, the discretionary function exemption of 28 U.S.C. § 2680(a) does not bar this suit. On the other hand, the decision whether or not to provide specific equipment in connection with the base electrical system, i.e., a ground fault circuit interrupter, is the kind of discretionary decision at a planning level, similar in character to formulation of safety specifications and procedures, which is immune from judicial review under section 2680(a).

Defendant next urges that it should be considered a "statutory employer" under the Nebraska Workmen's Compensation Law, *Neb.Rev.Stat.* §§ 48–101 *et seq.* (1978), and that it is therefore immune from liability on state law grounds. In this regard, defendant relies on the fact that as part of its contract with plaintiff's employer, the United States required OK Electric to obtain workmen's compensation insurance. The United States reasons that the cost of such insurance was therefore implicitly included in OK Electric's bid price for its electrical work. Consequently, the United States urges that it has indirectly paid for the workmen's compensation coverage provided to plaintiff, and that as a result, it is entitled to the immunity from suit enjoyed by immediate employers under *Neb.Rev.Stat.* § 48–111 (1978).

For this proposition defendant cites *Thomas v. Calavar Corp.,* 679 F.2d 416 (5th Cir.1982); *Griffin v. United States,* 644 F.2d 846 (10th Cir.1981); *Roelofs v. United States,* 501 F.2d 87 (5th Cir.1974), *cert. denied,* 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975), and *Olveda v. United States,* 508 F.Supp. 255 (E.D.Tex.1981). These decisions, however, turned upon express statutory provisions of Louisiana, Kansas and Colorado law which include within the definition of an "employer" who is liable for workmen's compensation coverage, a principal who employs a contractor to perform work which is part of the principal's trade, business or occupation. In such event, the principal is liable, as a statutory employer, to the contractor's employees for workmen's compensation coverage but is not liable in tort. The employee is therefore provided with "two debtors" from whom he can obtain workmen's compensation, and both employers, in return, enjoy exemption from certain tort liability. One reason cited for affording the United States the protection of these specific statutory provisions is that it has indirectly borne the cost of its contractors' workmen's compensation insurance.

Nebraska's definition of a "statutory employer," however, is much narrower. The Nebraska workmen's compensation scheme neither assigns workmen's compensation liability to principals who hire contractors to perform work within the principal's trade or business, nor does it recognize as a statutory employer one who ultimately bears the insurance costs.

■ *Neb.Rev.Stat.* § 48–116 (1978) designates as a statutory employer only a principal who employs a "scheme, artifice or device" to avoid or defeat the provisions of the workmen's compensation law. *See Peak v. Small Business Administration,* 666 F.2d 1121, 1122 (8th Cir.1981). Furthermore, a principal who requires his contractor to procure workmen's compensation coverage is expressly excluded from the meaning of statutory employer. *Neb.Rev. Stat.* § 48–116 (1978); *Matthews v. G.A. Crancer Co.,* 117 Neb. 805, 808–09, 223 N.W. 661, 662 (1929). The United States does not contend that it employed any scheme, artifice or device to evade the Nebraska Workmen's Compensation Law. In fact, the United States did require OK Electric to obtain workmen's compensation coverage, and the contractor did so. The Court finds that the defendant does not enjoy immunity from this suit as a statutory employer under Nebraska law.

Defendant next asserts a defense which it entitles "delegability of duty." Defendant construes plaintiff's claims as an effort to impose on the United States either vicarious liability for the negligence of OK Electric or some form of absolute or strict liability in tort.

■ It is well established that the United States may not be held vicariously liable for the acts or omissions of its independent contractors. *See* 28 U.S.C. § 2671; *United States v. Orleans*, 425 U.S. 807, 813–16, 819, 96 S.Ct. 1971, 1975–76, 1978, 48 L.Ed.2d 390 (1976); *Gibson v. United States*, 567 F.2d 1237, 1242–43 (3d Cir. 1977), *cert. denied*, 436 U.S. 925, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978). Nor can the liability of the United States under the Federal Tort Claims Act be premised on any theory of absolute or strict liability. *See* 28 U.S.C. § 2672 (requiring a "negligent or wrongful act or omission"); *Laird v. Nelms*, 406 U.S. 797, 801–03, 92 S.Ct. 1899, 1901–02, 32 L.Ed.2d 499 (1972); *Flynn v. United States*, 631 F.2d 678, 681–82 (10th Cir.1980).

■ Sections 416 and 427 of the *Restatement (Second) of Torts* (1965) state the principles of tort law to which the defendant presumably refers. One engaging an independent contractor to perform peculiarly or inherently dangerous work has a nondelegable duty to assure that the work is performed safely, and the negligence of the contractor performing such work is imputed to the employer of the contractor, regardless of any actual or active fault on the part of the employer. The theories of imputed or strict liability embodied in sections 416 and 427 of the *Restatement* may not serve as the basis of a claim against the United States, even if, under state law, the liability of a private owner or employer can be premised on these principles. *Flynn*, 631 F.2d at 681–82; *Gibson*, 567 F.2d at 1243–44.

■ On the other hand, related but distinguishable theories of culpability may form the basis of a tort claim against the United States. An employer of an independent contractor may be liable for its own negligence in permitting or directing its contractor to perform hazardous activity under conditions which violate applicable safety requirements or which omit foreseeably necessary safety precautions. *Madison*, 679 F.2d at 740–41; *Rooney v. United States*, 634 F.2d 1238, 1243–44 (9th Cir. 1980); *McGarry v. United States*, 549 F.2d 587, 590–91 (9th Cir.1976); *Barron v. United States*, 473 F.Supp. 1077, 1082–83 (D.Hawaii 1979), *modified on other grounds*, 654 F.2d 644, 646–47 (9th Cir. 1981). *See generally, Restatement (Second) of Torts* §§ 410, 413 (1965). Furthermore, if the employer of an independent contractor retains a sufficient degree of control over the manner in which a contract is to be performed, and the employer, such as the United States, fails to exercise reasonable care in those matters in which it has retained primary responsibility, it may be liable for its own direct, not imputed, negligence. *Alexander v. United States*, 605 F.2d 828, 835 (5th Cir.1979); *Aretz v. United States*, 604 F.2d 417, 429–31 (5th Cir.1979); *Fentress v. United States*, 431 F.2d 824, 828–29 (7th Cir.1970). *See generally, Restatement (Second) of Torts* § 414 (1965). The Court finds that plaintiff tried this case on theories of direct and actual negligence by the United States, not vicarious or strict liability.

■ Under Nebraska law, a person having work performed by an independent contractor may be liable for injuries sustained by employees of the contractor. *Simon v. Omaha Public Power Dist.*, 189 Neb. 183, 191–94, 202 N.W.2d 157, 163–64 (1972). The owner of premises on which work is being performed has an affirmative duty to employees of his independent contractor to use "that degree of care in furnishing a safe place to work which reasonable and prudent men would exercise under like circumstances." *Id.* at 193, 202 N.W.2d at 164. The employer may not escape his duty to take appropriate measures to avoid harm to others "by employing a contractor to do what it was [the employer's] duty to do, to prevent such injurious consequences .... and this duty continu-

ously remains with the employer." *Id.* at 194, 202 N.W.2d at 165.

Furthermore, in Nebraska an owner of facilities for the transmission of electricity owes a duty to exercise "a very high degree of care to safeguard those whose lawful activities expose them to the risk of inadvertent contact with the electric lines," including employees of independent contractors working near the lines. *Lorence v. Omaha Public Power Dist.*, 191 Neb. 68, 72, 214 N.W.2d 238, 240 (1974); *Gillotte v. Omaha Public Power Dist.*, 185 Neb. 296, 301, 176 N.W.2d 24, 27 (1970). The generation and distribution of electricity has been recognized as "the transmission of a dangerous commodity," *Roos v. Consumers Public Power Dist.*, 171 Neb. 563, 571, 106 N.W.2d 871, 876 (1961), and the Court finds that working on or near high voltage power lines is an inherently or intrinsically dangerous activity.

It is clear, therefore, that under Nebraska law, the United States owed plaintiff a very high standard of care to safeguard him from inadvertent contact with electrical current while working on the Offutt electrical system. The Court finds that the defendant breached its duty of care by permitting plaintiff to perform hazardous duties under conditions which violated established safety standards, and further that the United States failed to exercise reasonable care in a matter as to which it had retained primary responsibility, i.e., the decision whether or when to de-energize the power lines.

Paragraph 13 of the blueprints and specifications [the plans] for the project states that "control of the base electrical system is the responsibility of the Base Electrical Superintendent" and that "work must be performed in accordance with AFP 85–1, Electrical Facilities Safe Practices Handbook, and SAC supplements thereto."

AFP 85–1 prescribes "safe practices and procedures for personnel engaged in maintaining and operating electric systems and facilities" and states that "[t]he rules and recommendations herein are directive in na-

ture and will be followed at all Air Force installations." Section 1–9(a) of AFP 85–1 directs with respect to energized circuits that:

> *Whenever possible, electrical circuits and equipment will be deenergized before working on them.* However, work will be performed on energized circuits and equipment *when certified by the Base Civil Engineer, or a designated subordinate supervisor of his organization, as necessary to support a critical mission, prevent injury to persons or protect property.* [Emphasis added.]

Section 1–9(a) of the SAC Supplement 1 to AFP 85–1 contains the following directives regarding work on or adjacent to high voltage lines:

> *The SAC policy is to perform exterior electrical maintenance work on isolated deenergized lines to the maximum extent possible. This will include scheduling of power outages for the performance of essential electrical maintenance and/or repair, except as follows:*
>
> (1) (Added). *In emergency situations, hot line work may be performed;* but only under the direct supervision of the assigned superintendent, foreman, or other certified lineman as defined in paragraph 1–2a. Certified linemen may not assume the role of safety supervisor except when the normally assigned foreman is absent from the base.
>
> (2) *Hot line work will be performed only after validation of the safe clearance procedure by the electrical superintendent or, in his absence, by the assigned foreman* indicating the work can be accomplished safely with available resources. *The base civil engineer,* or in his absence, the associate/deputy base civil engineer or the chief of operations and maintenance, *must personally determine that hot line work is required*
> . . . .
>
> (3) *All work performed on or adjacent to electrical circuits using nominal voltage which is in excess of 600 volts must be performed under the proce-*

*dures outlined in Section G.* After normal duty hours, emergencies requiring circuit isolation be (sic) switching of high voltage circuits will be accomplished by certified technicians as specified in paragraph 7–2c(3), below, and in accordance with safe clearance procedures. [Emphasis added.]

Section G of AFP 85–1 sets forth a safe clearance procedure to be administered by base personnel as a mandatory prerequisite to authorizing hot line work. Section 7–4(a) of Section G states in part that "[w]ork must not be performed on energized lines or equipment except as permitted herein." Section 7–4(d) prohibits work, with limited exceptions, "on energized lines or equipment operating at more than 5,000 volts between conductors ... *except in cases of actual necessity ....*" [Emphasis added.] The lines in question operated in excess of 5,000 volts.

The National Electric Safety Code, Rules for the Operation of Electric-Supply and Communications Lines and Equipment, requires owner/operators of electrical systems to provide adequate instructions and protective devices for persons working on or about electrical lines and equipment. Section 1–8(b) of AFP 85–1 provides that the requirements of the National Electric Safety Code are mandatory for all applicable Air Force facilities and that the Code contains "basic minimum provisions considered necessary for safety."

The testimony of Ronald Peterson, present Base Electrical Engineer, Joseph Burgess, Base Electrical Engineer at the time of the accident, Dale Furby, Base Electrical Superintendent at the time of the accident and Jarold Smith, Chief of Construction Management for the project, established the following facts with respect to the work plaintiff was performing when injured. The overhead lines carrying the current which injured plaintiff could have been de-energized with a short period of prior notice. No request for such a power outage had been denied for at least thirteen years. Backup generators were available to provide power to critical areas of the base during an outage. No government personnel "personally determine[d] that hot line work [was] required" for the duties plaintiff was to perform. There was, in fact, no necessity that the lines remain energized while the work was in progress. No validation of the safe clearance procedure for hot line work was performed by the Base Electrical Superintendent or any other government personnel. Any hazard of inadvertent contact with electricity from the overhead span would have been completely avoided by a temporary power outage.

Apparently, the position of the United States with respect to the decision to leave the lines energized during plaintiff's part of the job turns on the failure of Victor Hinrichs, Job Superintendent for OK Electric, to request a power outage from Dale Furby, Base Electrical Superintendent. However, the testimony of Hinrichs indicates that the option to obtain a power outage for plaintiff's duties was never effectively communicated to Hinrichs, if mentioned at all. In fact, Hinrichs either assumed from the conduct of government officials or was told that the Air Force wanted the electricity to remain on during the period plaintiff was to be working on the lines.

Furthermore, Furby conceded that the plans placed the responsibility for control of the base electrical system on himself, and it is clear from AFP 85–1 and the SAC Supplement, incorporated into the contract, that the decision as to if and when a power outage could be scheduled remained the prerogative of the United States. Furby also admitted that no actual necessity to leave the lines energized existed and that permitting work on or adjacent to hot lines, in the absence of actual necessity, violated the safety directives of AFP 85–1 and the SAC Supplement. The Court agrees with this conclusion and finds that the United States unnecessarily endangered plaintiff in violation of its duty to exercise a high degree of care for his safety.

 The defendant's violation of the previously cited provisions of AFP 85–1

and the SAC Supplement may not amount to negligence per se but does provide convincing evidence of negligence. The breach of a voluntarily assumed standard of care set forth in a "private regulation" may provide independent evidence of negligence under Nebraska law. *Simon*, 189 Neb. at 195–96, 202 N.W.2d at 165–67. Expert evidence offered at trial indicated that the directives of AFP 85–1 and the SAC Supplement are consistent with industry standards for owner/operators of electrical systems. The safety measures directed by these documents are relevant and persuasive evidence of the duty of care owed by the United States to plaintiff in the circumstances of this case. *See generally, Union Pac. R.R. Co. v. Blank*, 167 F.2d 291, 297–98 (8th Cir.1948).

The United States acted unreasonably in allowing plaintiff to work on and in close proximity to energized lines, including making connections to a hot line, in the absence of any necessity for such a risky procedure and in the absence of the mandated safe clearance validation. Furthermore, Air Force personnel exercised no supervision whatever to ensure that plaintiff had adequate equipment for his own protection, such as an insulated bucket, insulated blankets and hoses and properly tested insulated gloves.

*Negligence of OK Electric*

The Court finds that OK Electric, plaintiff's immediate employer, negligently failed to provide plaintiff with sufficient personnel, equipment, instruction and supervision. OK Electric assigned plaintiff and his co-worker the job of working on and in close proximity to energized lines without the benefit of a third person to serve as a ground man, i.e., to observe the overhead workers from below and to warn them if they too closely approached the energized wires. In addition, OK Electric failed to provide plaintiff with adequate equipment, such as an insulated bucket and properly tested rubber gloves. OK Electric also failed to instruct plaintiff and his co-worker as to the proper sequence of steps in which to perform the work so as to

minimize the danger of inadvertent contact with electrical current and failed to maintain on-site supervision while plaintiff and his co-worker were working on premium time. *See generally, Lownes v. Furman*, 161 Neb. 57, 62–64, 71 N.W.2d 661, 664–65 (1955) [employer has continuous duty to furnish reasonably safe tools and equipment, to make seasonable inspections and to supply competent supervisors where "reasonably necessary to prevent undue risk of harm" to employee.]

*Assumption of Risk and Contributory Negligence*

Approximately a week before the injury occurred, the Base Electrical Superintendent met with the OK Electric Job Superintendent and others, not including plaintiff, to determine how plaintiff's portion of the work should be accomplished. Base personnel, either alone or with the acquiescence of OK Electric, decided that the lines would remain energized. This decision, made without consultation with plaintiff, violated the safety standards adopted by the Air Force in AFP 85–1 and the SAC Supplement. Having authorized or directed hot line work, the United States then took no steps to implement or enforce appropriate safety measures.

Now the United States urges that plaintiff failed to extricate himself from a position of known danger near energized power lines, amounting to assumption of the risk or gross contributory negligence on his part. *Cf., Lorence*, 191 Neb. at 73, 214 N.W.2d at 241. Plaintiff counters that he was presented with the decision in which he had no part that his job involved working on or adjacent to energized wires, a position from which he could voluntarily extricate himself only by refusing to do his job.

Plaintiff relies on cases which recognize that an employee, undertaking duties in response to a command by his superior, is not held as a matter of law to have assumed risks, in connection with such duties, which were unnecessarily and unreasonably created by his employer or by others. *See, e.g., Martin v. George Hy-*

man Const. Co., 395 A.2d 63, 73 (D.C.1978) ["[e]ven where the risk becomes apparent only during the course of employment, similar pressures to encounter the risk may exist. Although an express threat of discharge for failure to encounter a risk posed by an employer's breach of the duty to provide safe working conditions might now be rare, the fear of incurring the employer's displeasure by failing to encounter a job-related hazard may not be unfounded .... Indeed, the wage earner's own sense of loyalty to his employer may encourage a disregard for his own safety in order that he might more effectively go about his employer's business."] See also, Chaney v. Brupbacher, 242 So.2d 627, 632 (La.App. 1970); Dow v. Tarkington, 452 P.2d 135, 136 (Okl.1969); Anderson v. Evans, 164 Neb. 599, 607, 83 N.W.2d 59, 65 (1957); Williams v. Hofer, 30 Wash.2d 253, 191 P.2d 306, 309–10 (1948); Haynes Drilling Corp. v. Smith, 200 Ark. 1098, 143 S.W.2d 27, 30–31 (1940); Phares v. Century Elec. Co., 131 S.W.2d 879, 883 (Mo.App.1938); Owosso Mfg. Co. v. Drennan, 182 Ark. 389, 31 S.W.2d 762, 764 (Ark.1930); Tull v. Kansas City S. Ry. Co., 216 S.W. 572, 572–73 (Mo.App.1919); Thomsen v. Jobst, 93 Neb. 375, 377–78, 140 N.W. 269, 270 (1913). Cf., Farmers Coop. Elevator Ass'n v. Strand, 382 F.2d 224, 230 (8th Cir.1967) ["[a] person for whose protection a safety law, order, or regulation has been passed does not assume the risks of the dangerous condition resulting from a violation thereof."]

█ In the circumstances present in this case, the Court finds that plaintiff did not perceive that he had a viable alternative to working on hot wires. The decision to proceed with energized lines was not made with plaintiff's consent, and he was merely directed as to when and how to perform the work. The Court finds that plaintiff did not assume the risk of the defendant's negligence when he failed to refuse to do the work as ordered. Furthermore, the record reflects that plaintiff believed the work could be performed safely and that he did not know of or at least appreciate the danger which had been cre-ated by the combined effect of energized wires, inadequate equipment, insufficient personnel, and the absence of a safe clearance procedure and proper instructions. See Jensen v. Hawkins Constr. Co., 193 Neb. 220, 226, 226 N.W.2d 346, 350–51 (1975) ["a plaintiff does not assume a risk of harm arising from the defendant's conduct unless he then knows of the existence of the risk and appreciates its unreasonable character, or the danger involved, including the magnitude thereof, and voluntarily accepts the risk."]

Defendant urges, in addition, that plaintiff's injury was caused by his own contributory negligence in undertaking the work without proper equipment, especially rubber gloves, rubber blankets, and an insulated bucket. With respect to the gloves, the Court credits the evidence presented that declining to use rubber gloves was not unreasonable in plaintiff's circumstances, specifically when working with hot line tools such as a hot stick or when performing hot line work out of an uninsulated bucket.

█ In light of plaintiff's reasonable concern that rubber gloves prevent the detection of brush discharge and the breakdown of the insulation of a hot stick and that the gloves made available to him had not been laboratory tested for minute holes within a year, plaintiff's decision not to use rubber gloves was not negligent. The Court also credits the evidence that the use of rubber blankets in an effort to provide insulation to an uninsulated bucket is dangerous and contrary to accepted industry practice. Therefore, plaintiff's failure to use rubber blankets was not unreasonable in the circumstances.

However, the Court finds that plaintiff was in fact negligent in proceeding without the benefit of an insulated bucket. There is evidence in the record that plaintiff, without serious risk to his job, could have required OK Electric to rent or otherwise furnish him with an insulated bucket, in which event plaintiff would not have suffered his massive injuries.

Furthermore, plaintiff may have failed, during the course of the work, to observe minimum safe clearance distances from the energized overhead line, as alleged by defendant. However, given the confusion over the exact manner in which plaintiff's contact with electrical current occurred, defendant has failed to prove by a preponderance of the evidence that plaintiff did in fact err in this manner. Even if plaintiff did fail to maintain a safe body clearance, the Court finds that his negligence in this regard and in the matter of proceeding without an insulated bucket would still have been no more than slight in comparison with the negligence of the defendant, which was gross. *See Neb.Rev.Stat.* § 25–1151 (1979).

*Causation*

■■■ The Court finds that the defendant's failure to de-energize its high voltage transmission lines operated as the primary moving cause of plaintiff's injury. In addition, the failure of Air Force officials to implement and enforce necessary safety measures once the decision to authorize hot line work had been made functioned as a joint and concurring cause of the injury, along with the negligent failure of OK Electric to furnish plaintiff with adequate equipment, instructions, supervision and assistance. Plaintiff's own negligence in proceeding without an insulated bucket also operated as a contributing cause of the harm.

■■■ In Nebraska, a determination of "proximate cause" consists of three elements: (1) negligence without which injury would not have occurred, (2) injury which is the natural and probable consequence of the negligence and (3) the absence of an efficient, intervening cause breaking the causal connection between the injury and the acts or omissions of negligence. *Shelton v. Board of Regents of the Univ. of Nebraska,* 211 Neb. 820, 824–25, 320 N.W.2d 748, 752 (1982).

The Court finds that plaintiff's contact with electrical current would not have occurred but for the defendant's decision to leave the power on during plaintiff's work.

Nor would the injury have occurred had Air Force personnel performed a safe clearance validation and inspected or otherwise assured that plaintiff was adequately equipped for work on energized lines. Moreover, the injury would have been averted had OK Electric furnished plaintiff with adequate supporting personnel, equipment, instruction and supervision or had plaintiff insisted on an insulated bucket. Plaintiff's injury was the natural, foreseeable and probable consequence of working, ill-equipped and under-assisted, on and near high voltage wires which should reasonably have been de-energized for the short period in which his duties were to be performed.

Defendant contends that its acts and omissions created, at most, a passive and potential condition by which injury was merely made possible, and that the independent acts of OK Electric and plaintiff served as the efficient, intervening or superseding cause of the harm to plaintiff. *See generally, Connolley v. Omaha Public Power Dist.,* 185 Neb. 501, 177 N.W.2d 492 (1970).

The Court finds, on the contrary, that the facts of this case fall within the principle that "an accident may be proximately caused by separate and distinct acts of negligence of different parties which concur in producing the injury." *Chicago, Burlington & Quincy R.R. Co. v. Beninger,* 373 F.2d 854, 858 (8th Cir.1967). *Accord, McClelland v. Interstate Transit Lines,* 142 Neb. 439, 447, 6 N.W.2d 384, 390 (1942). As the negligence of the United States, OK Electric, and to a lesser extent, plaintiff concurred as the proximate cause or causes of plaintiff's injury, the United States is jointly and severally liable for plaintiff's damages, *Robinson v. Dawson County Irr. Co.,* 145 Neb. 32, 38, 15 N.W.2d 231, 234 (1944), as reduced pursuant to *Neb.Rev.Stat.* § 25–1151 (1979).

*Damages*

Plaintiff suffered severe electrical burns, the loss of a hand, substantial impairment in the functional use of his other hand and muscle and tissue loss in a leg. He en-

dured fifteen operations and is permanently scarred and disfigured. A functional evaluation by the hospital at which he has been receiving occupational therapy reveals substantial impairment of plaintiff's skills, not only in his vocational occupations, but in the most basic of tasks, such as eating, maintaining personal hygiene, writing, telephoning, driving, dressing and performing household tasks. His range of vocational and leisure activities has been sharply curtailed, and he will require assistance for the rest of his life in personal and professional endeavors.

■ The evidence established the following items of damages: $108,151.35 in medical and hospital expenses to date, $102,122.00 in lost wages to date, and $3,232.00 in lost fringe benefits to date. The Court finds, in addition, that $100,000.00 is an appropriate amount to compensate plaintiff for his pain and suffering and disability to date. Furthermore, plaintiff is entitled to an award of $475,000.00 to compensate him for future lost earnings and lost fringe benefits and pain, suffering and disability, reduced to present value.[1] *See generally, Jones & Laughlin Steel Corp. v. Pfeifer*, — U.S. —, 103 S.Ct. 2541, 2548–58, 76 L.Ed.2d 768 (1983); *Abbott v. Northwestern Bell Telephone Co.*, 197 Neb. 11, 16, 246 N.W.2d 647, 650 (1976). Therefore, plaintiff has established damages totalling $788,505.35.

*Contribution, Indemnity*

The contract between the United States and OK Electric, on page 11, incorporated by reference Armed Services Procurement Regulation (ASPR) 7–602.13 entitled "Permits and Responsibilities." In pertinent part this provision states:

The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any applicable Federal, State, and municipal laws, codes, and regulations, in connection with the prosecution of the work. *He shall be similarly responsible for all damages to persons or property that occur as a result of his fault or negligence.* [Emphasis added.]

The predecessor of this clause, apparently a standard provision of government fixed-price contracts since 1938, was interpreted and applied in *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970). In that case, an employee of a contractor suffered injuries while engaged in work which the contractor was performing for the United States under a government contract. The "permits and responsibilities" language construed in *Seckinger*, i.e.: "[The Contractor] shall be responsible for all damages to persons or property that occur as a result of his fault or negligence in connection with the prosecution of the work," differs in no material respect from the provision before this Court.

In *Seckinger*, the Supreme Court, applying federal law, held that the clause expressly imposes an indemnity obligation upon the contractor to reimburse the government to the extent of the contractor's percentage of negligence contributing to the plaintiff's injuries. *Id.* at 209–16, 90 S.Ct. at 884–87. *See also, Smith v. United States*, 497 F.2d 500, 506–07 (5th Cir.1974); *Morris v. Uhl & Lopez Engineers, Inc.*, 442 F.2d 1247, 1257 (10th Cir.1971). *Accord, Gibbs v. United States*, 599 F.2d 36, 40 (2d Cir.1979):

The starting point for analysis is *United States v. Seckinger*, 397 U.S. 203 [90

1. The Court found the evidence of Dr. Jerome Sherman, plaintiff's expert economist, persuasive as to plaintiff's probable work life as well as lost future earnings and fringe benefits. However, as to the present value to which these future benefits must be reduced, the testimony was conflicting regarding the propriety of discounting future losses using assumptions based on existing economic conditions. Plaintiff's ex-

pert contended that anticipated wage increases would entirely offset interest earnings upon a lump sum presently payable. Defendant's expert projected that interest earned on a lump sum award would outpace future probable wage increases by five percent. The Court regards a net discount rate of four percent as the appropriate figure and has reduced the gross amounts accordingly to arrive at the damages awarded.

S.Ct. 880, 25 L.Ed.2d 224] ... (1970), which established that federal law controls the interpretation of contracts between the government and private contractors .... The Court held that [the clause in *Seckinger*] required indemnity from the contractor on a comparative negligence basis for injury claims arising from the contract work .... In other words, the government could obtain indemnity from the contractor for that percentage of the government's liability to a tort claimant that corresponded to the percentage of the contractor's fault in contributing to the injury. But the government could not, under the clause, obtain indemnity for that percentage of its liability to the claimant attributable to the government's own negligence.

OK Electric urges that it is insulated from liability to the United States on the basis of Nebraska law precluding third-party claims for contribution or noncontractual indemnity against employers who have paid workmen's compensation benefits in connection with the underlying injuries. *See Vangreen v. Interstate Machinery and Supply Co.*, 197 Neb. 29, 246 N.W.2d 652 (1976).

 However, as previously stated, *Seckinger* rests on principles of contract construction and indemnity under federal, not state, law. In fact, whether a third-party suit against a negligent employer would have been barred or permitted under state workmen's compensation statutes was clearly irrelevant to the decision in *Seckinger*. *See Seckinger*, 397 U.S. at 214 n. 19, 90 S.Ct. at 886 n. 19. Moreover, *Vangreen*, on which OK Electric relies, did not purport to govern claims of contractual indemnity. *See Vangreen*, 197 Neb. at 33, 246 N.W.2d at 654. Nothing in the Nebraska Workmen's Compensation Law precludes an employer from agreeing to indemnify a third party. Thus, the Court finds that *Seckinger* is dispositive of the issue, and that the United States is entitled to partial indemnity from OK Electric to the extent that the plaintiff's injuries are attributable to the negligence of OK Elec-

tric. This result does not affect the joint and several liability of the United States to plaintiff. *Barron v. United States*, 654 F.2d 644, 648–49 (9th Cir.1981).

Judgment will therefore be entered in favor of the plaintiff on his complaint and in favor of the United States on its third-party complaint in accordance with the following apportionment. As previously stated, plaintiff has proved damages in the amount of $788,505.35. Pursuant to Nebraska's comparative negligence statute, *Neb.Rev.Stat.* § 25–1151 (1979), this amount must be reduced by ten percent (10%) or the sum of $78,850.53, which the Court finds is the amount corresponding to the percentage by which plaintiff's own negligence contributed to cause his injury. The United States is, therefore, liable to plaintiff for the sum of $709,654.82, from which OK Electric or its workmen's compensation insurer will satisfy its subrogation rights pursuant to *Neb.Rev.Stat.* § 48–118 (1978). A hearing will be held to determine this amount.

As to the third-party complaint, the Court finds that plaintiff's injury is attributable fifty percent (50%) to the negligence of the United States and forty percent (40%) to the negligence of OK Electric. Therefore, judgment will be entered in favor of the United States against OK Electric in the amount of $315,402.14 on the third-party complaint.

An order has been entered contemporaneously herewith in accordance with this Memorandum Opinion.