Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/14/2018 08:09 AM CDT

Jacobs Engineering Group Inc., appellee,
v. ConAgra Foods, Inc., appellant.
___ N.W.2d ___

Filed September 14, 2018.    No. S-16-896.

1. **Actions: Parties: Standing.** Whether a party who commences an action
   has standing and is therefore the real party in interest presents a jurisdic-
   tional issue.
2. **Judgments: Jurisdiction: Appeal and Error.** When a jurisdictional
   question does not involve a factual dispute, determination of a juris-
   dictional issue is a matter of law which requires an appellate court to
   reach a conclusion independent from the trial court's; however, when
   a determination rests on factual findings, a trial court's decision on the
   issue will be upheld unless the factual findings concerning jurisdiction
   are clearly incorrect.
3. **Directed Verdict: Appeal and Error.** In reviewing a trial court's rul-
   ing on a motion for directed verdict, an appellate court must treat the
   motion as an admission of the truth of all competent evidence submit-
   ted on behalf of the party against whom the motion is directed; such
   being the case, the party against whom the motion is directed is entitled
   to have every controverted fact resolved in its favor and to have the
   benefit of every inference which can reasonably be deduced from
   the evidence.
4. **Directed Verdict: Evidence.** A directed verdict is proper at the close of
   all the evidence only when reasonable minds cannot differ and can draw
   but one conclusion from the evidence, that is, when an issue should be
   decided as a matter of law.
5. **Judgments: Appeal and Error.** An appellate court reviews a denial of
   a motion to alter or amend the judgment for an abuse of discretion.
6. **Motions for New Trial: Appeal and Error.** An appellate court reviews
   a trial court's ruling on a motion for a new trial for an abuse of
   discretion.
7. **Contracts.** Contract interpretation presents a question of law.

8. **Jury Instructions.** Whether the jury instructions given by a trial court are correct is a question of law.

9. **Judgments: Appeal and Error.** An appellate court independently reviews questions of law decided by a lower court.

10. **Verdicts: Appeal and Error.** When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.

11. **Verdicts: Juries: Appeal and Error.** A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.

12. **Actions: Parties: Standing.** The focus of the real party in interest inquiry is whether the party has standing to sue due to some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of controversy.

13. **Standing: Jurisdiction: Parties.** Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's or tribunal's exercising its jurisdiction and remedial powers on the party's behalf.

14. **Actions: Parties: Jurisdiction: Standing.** The question of whether a party who commences an action has standing and is therefore the real party in interest is jurisdictional. Because the requirement of standing is fundamental to a court's exercise of jurisdiction, either a litigant or a court can raise the question of standing at any time.

15. **Standing.** The stage of the litigation in which a party claims that its opponent lacks standing affects how a court should dispose of the claim.

16. **Standing: Pleadings: Pretrial Procedure.** In resolving a facial challenge, a court will review the pleadings to determine whether there are sufficient allegations to establish the plaintiff's standing.

17. **Motions to Dismiss: Jurisdiction: Pleadings: Appeal and Error.** An appellate court reviews a trial court's decision on a motion to dismiss for lack of subject matter jurisdiction based on a facial attack on the pleadings de novo.

18. ____: ____: ____: ____. Where the trial court's decision on a motion to dismiss for lack of subject matter jurisdiction is based on a factual challenge, the court's factual findings are reviewed under the clearly erroneous standard.

19. **Insurance: Contracts: Words and Phrases.** An indemnity contract is a chose in action because it confers a right to bring a legal action to recover a sum of money from or out of the contract.

20. **Liability: Damages.** Indemnification is available when one party is compelled to pay money which in justice another ought to pay or has agreed to pay.

21. **Pleadings: Evidence: Words and Phrases.** A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that the proposition of fact alleged by the opponent is true.

22. **Jurisdiction.** While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction created by waiver, estoppel, consent, or conduct of the parties, such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission.

23. **Pretrial Procedure: Pleadings.** A general denial is not effective where an answer contains specific admissions of facts alleged.

24. **Actions: Parties: Intent.** The primary purpose of the real party in interest requirement is to protect the defendant from the risk of multiple litigation.

25. **Insurance: Damages.** Under the collateral source rule, the fact that the party seeking recovery has been wholly or partially indemnified for a loss by insurance or otherwise cannot be set up by the wrongdoer in mitigation of damages.

26. **Circumstantial Evidence: Proof.** Circumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact.

27. **Evidence: Proof.** A finder of fact may draw reasonable inferences from the facts and circumstances proved.

28. **Contracts: Words and Phrases.** An indemnity agreement is a contract to be construed according to the principles generally applied in construction or interpretation of other contracts.

29. **Contracts.** A contract must receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract.

30. **Workers' Compensation: Liability: Contracts.** When an employer, liable to an employee under the Nebraska Workers' Compensation Act, agrees to indemnify a third party for a loss sustained as the result of the third party's payment to the indemnitor's employee, the employer's exclusion from liability accorded by the act does not preclude the third party's action to enforce the indemnity agreement with the indemnitor-employer.

31. **Jury Instructions: Pleadings: Evidence.** A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.

32. **Jury Instructions: Appeal and Error.** If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and

adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.

33. **Verdicts: Appeal and Error.** Where a party has sustained the burden and expense of trial and has succeeded in securing a verdict on the facts in issue, that party has the right to keep the benefit of the verdict unless there is prejudicial error in the proceedings by which it was secured.

34. **Negligence.** A party is only answerable for the natural, probable, reasonable, and proximate consequences of his acts; and where some new efficient cause intervenes, not set in motion by him, and not connected with but independent of his acts and not flowing therefrom, and not reasonably in the nature of things to be contemplated or foreseen by him, and produced the injury, it is the dominant cause.

35. ____. Because the extent of foreseeable risk depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.

36. **Verdicts: Appeal and Error.** A civil verdict will not be set aside where evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of fact.

37. **Negligence: Liability.** Where separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage, although one of them alone could not have caused the result.

38. **Damages: Appeal and Error.** The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.

39. **Verdicts: Remittitur.** Where a verdict is excessive, but not so much as to indicate passion or prejudice on the part of the jury, the error may be corrected by remittitur, if the excess can be estimated with reasonable certainty.

40. **Remittitur: Appeal and Error.** An appellate court should order remittitur only when the award is contrary to all reason.

Appeal from the District Court for Douglas County: Gary B. Randall, Judge. Affirmed.

Christopher Landau, P.C., of Kirkland & Ellis, L.L.P., William F. Hargens and Lauren R. Goodman, of McGrath, North, Mullin & Kratz, P.C., L.L.O., and on brief, Jeremy M. Feigenbaum, for appellant.

Stephen B. Kinnaird and Sarah G. Besnoff, of Paul Hastings, L.L.P., Gilbert S. Keteltas, Robert G. Abrams, and Thomas E. Hogan, of Baker Hostetler, L.L.P., and Shawn D. Renner and Andre R. Barry, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., for appellee.

HEAVICAN, C.J., MILLER-LERMAN, CASSEL, STACY, KELCH, and FUNKE, JJ.

FUNKE, J.

This case arises out of an explosion at a ConAgra Foods, Inc. (ConAgra), plant in Garner, North Carolina, which killed 3 ConAgra employees and injured more than 60 others. When dozens of employees sued Jacobs Engineering Group Inc. (Jacobs), Jacobs sought contractual indemnification from ConAgra, but ConAgra declined, and Jacobs defended against and settled the claims.

Jacobs sued ConAgra for indemnification in the district court for Douglas County. Following a 4-week trial, the jury awarded Jacobs the full amount of the settlement payments, $108.9 million, and the court entered judgment on the verdict. We affirm.

## I. BACKGROUND

### 1. CONTRACT BETWEEN
### JACOBS AND CONAGRA

ConAgra, a food manufacturer, contracted with Jacobs, an engineering firm, in 2007 to provide engineering services. Jacobs' work under the contract was limited to work requested and approved by ConAgra in work orders. Section 10 of the parties' engineering agreement contained mutual indemnification provisions which provided that each party indemnify the other for "claims, losses, costs, penalties, damages and/or expenses" to the extent caused by the indemnifying party's negligence or the negligence of others under that party's control. Section 10 provided the following relevant indemnification provisions:

10.1 [Jacobs] shall indemnify . . . ConAgra . . . against each and every claim, loss, cost, penalty, damage, or expense . . . suffered or incurred by any third parties, employees of ConAgra and employees of [Jacobs]. [Jacobs'] obligations hereunder shall be limited to the extent caused by the negligent acts, errors or omissions of [Jacobs], or anyone directly or indirectly employed by [Jacobs] or for whose acts [Jacobs] is otherwise liable. . . .

10.2 [Jacobs'] liability, however arising by reason of the performance of the services, is specifically limited as provided herein and ConAgra will indemnify and release [Jacobs] against all other claims, losses, costs, penalties, damages and/or expenses to the extent caused by the negligence of ConAgra and/or others under its control[.]

In 2008, ConAgra planned to update the Garner plant's water heating system. ConAgra rejected Jacobs' proposal for the project as too expensive, but retained Jacobs to provide limited management and engineering support. Jacobs designated an onsite project manager, Donald Pottner, to assist with the project.

## 2. ENERGY SYSTEMS ANALYSTS AND CONAGRA'S SAFETY POLICIES

ConAgra hired Energy Systems Analysts (ESA), a high-efficiency water heater contractor, to design and install a 5-million Btu gas-fired water heater. ConAgra had previously engaged ESA to supply gas heat systems to plants in Iowa, Ohio, Pennsylvania, and Tennessee, and ConAgra had not experienced any safety issues with ESA.

ConAgra contractually imposed safety requirements on ESA's work on the project. The contract required ESA to "abide by safety . . . rules at all times while on company property." ConAgra personnel were required to bring "[a]pparent violations" of the "Contractor Work Rules" "or unacceptable industry work practices . . . to the attention of the contractor's representative for prompt correction."

The contractor work rules required "practices differing from [ConAgra] policy . . . to be reviewed by [ConAgra] before the implementation." The work rules placed responsibility for correction of "unacceptable conditions" on the "'controlling employer,' that is, the one in the best position to correct the situation or ensure its correction." ConAgra's management was required to report "[a]ny safety discrepancy observed . . . to the appropriate Contractor representative for immediate correction" and to suspend work "immediately" in the case of danger until "safety concern(s) have been corrected, to the satisfaction of the Company."

The contractor work rules made ConAgra responsible for ensuring that ESA prepared a "Safe Plan of Action" (SPA) for its commissioning of the water heater to identify risks and outline each step of the process in order to complete the work safely. ConAgra also had a "Fire Prevention Plan" which required "special care and handling" requirements for flammable gases that "pose a risk of catastrophic explosion if ignited." The fire prevention plan applied to all ConAgra facilities and set "procedures for controlling the hazards," required identification of "potential ignition sources," and only permitted the use or handling of natural gas "where vapors are prevented from reaching ignition sources."

### 3. GARNER PLANT WATER
### HEATER PROJECT

ConAgra employee, Timothy Yost, was the engineering manager and supervisor at the Garner plant. ConAgra designated Yost as the individual responsible for the safety of all plant employees during the commissioning of the water heater. Yost was responsible for ensuring that ESA's plans complied with ConAgra standards and the contractor work rules. ConAgra's utility maintenance supervisor, John Puff, led the Garner plant's utilities department and was responsible for its natural gas facilities.

ESA staff testified about the amount of control ConAgra exercised over the installation of the water heater. ESA's

corporate designee testified that ConAgra had the final say on the project and controlled the schedule. He stated that Yost and Puff "were the decision-makers when it came to anything, even . . . when we were on site. If there was something that they didn't like, we'd obviously have to change it." He admitted that ConAgra did not provide directions of how the gas delivery system should be assembled.

On June 3, 2009, ESA provided its written plan for commissioning the water heater, which Yost and Puff reviewed and found acceptable. On June 4, Pottner left the plant on a planned medical leave and was not expected to return, and he ultimately was not present during the commissioning of the water heater. ConAgra confirmed its personnel would supervise the commissioning and that Jacobs' services were not needed.

Puff was responsible for determining the procedure to connect the new equipment to the plant's gas supply referred to as the "line-break" procedure. The written procedure required opening valves to purge gaslines at both the boiler and the hot water tank. The purpose of the purge was to remove any remaining mixture of air and natural gas in the line prior to firing the hot water heater. ConAgra identified explosion as a risk and specified completion of the line-break procedure as the method to control that risk.

On June 4, 2009, as part of the line-break procedure, Puff instructed the crew to purge the line to the boiler with a hose leading outside, but he failed to provide the instruction to purge the line to the hot water tank. Puff stated that "[w]e just didn't get to it." Yost admitted the line to the hot water tank should have been purged before startup to prevent an explosive mixture.

On June 5, 2009, at the direction of Yost, a ConAgra senior safety specialist inspected the pumproom where the new water heater was located. The report documented "[e]xposed wires" as possible ignition source hazards.

Curt Poppe, an ESA employee, was assigned to commission the water heater. On June 9, 2009, Poppe arrived at the

Garner plant and met with Yost to discuss the commission plan. Poppe's commissioning plan did not include purging air from the lines, and Puff did not provide the line-break procedure to Poppe. Yost and Puff did not train Poppe in ConAgra's contractor work rules or ensure that Poppe was certified as trained. In addition, no SPA was prepared for the project. ConAgra admitted that had an SPA been implemented, the explosion may have been prevented.

ConAgra's policy and practice included supervising the work of contractors, and the utilities department did not allow contractors to work on utilities unsupervised. Puff assigned a ConAgra employee, Ethner "Buddy" Roberson, to supervise Poppe during commissioning. Roberson worked with Poppe throughout the morning and, with Puff's knowledge, brought unrated temporary lighting into the room. Roberson had not reviewed the fire prevention plan, was not aware that combustibles should not be released into a room with ignition sources, and did not know whether the lighting he strung in the pumproom was safe for a flammable atmosphere.

When Poppe began the commission process, he had difficulty lighting the water heater. Over the next 3½ hours, Poppe repeatedly cracked the valve on the ⅜-inch pilotline and placed a gas meter in front of the line as he released small streams of gas into the room. Poppe said he was "'bleeding the line.'" He attempted to light the water heater 32 times.

Multiple ConAgra employees, including management, witnessed Poppe release gas into the room and were concerned about the presence of gas. A ConAgra utilities department employee smelled "[t]oo much gas" in the room and felt he was "in danger." He reported Poppe's unusual actions to Puff, who reported them to Yost.

Yost, and later Puff, went into the room and smelled gas. Puff admitted he did not tell Poppe that the line had not been purged, even after Puff realized Poppe was struggling to light the heater.

Puff was trained to purge lines outside; he had purged one of the lines outside on June 4, 2009. Puff "started smelling a lot

of gas" and thought "pure gas" was coming through the line. Puff was concerned that Poppe was not using the correct meter to measure the presence of gas or was using the meter improperly. A ConAgra witness admitted that under the contractor work rules, if the gas meter malfunctioned, then the commission should have been stopped.

There was evidence that Puff could have ordered an evacuation, but failed to do so. As the only designated plant emergency coordinator working that day, Puff controlled the decision to evacuate. An emergency evacuation plan stated that evacuation may be necessary in the face of "[i]mmediate or potential fire hazards" and could be completed within 3 minutes.

Puff interrupted the commission process so that he and Poppe could walk outside to allow Poppe to calibrate the gas meter in fresh air. Puff then left the plant to pick up supplies for another project. Puff left Poppe with Roberson even though Puff testified that he did not believe Roberson was qualified to supervise clearing air from a gasline. Roberson thought something was wrong and went to the roof to try to locate an alternate purge point.

Poppe returned to the pumproom and released gas by opening the cap on the 2-inch gas pipe. The room flooded with gas in less than 60 seconds. Puff admitted he "'should have stayed around a lot longer'" and had given the contractor "'more credit'" than he should have. When asked about Poppe's opening the cap on the gas pipe, Puff testified that if he had stayed, he "wouldn't have allowed that."

The pumproom exploded. Two sections of the plant's roof collapsed, killing three ConAgra employees and inflicting serious injuries on others.

### 4. EXPLOSION INVESTIGATION
#### AND LITIGATION

The North Carolina Department of Labor conducted an investigation into the explosion and found multiple violations of North Carolina code. The department determined that

ConAgra violated its duty to furnish conditions of employment "free from recognized hazards that were causing or likely to cause death or serious physical harm." The department found multiple life-threatening conditions occurred in the presence of ConAgra management, including ConAgra's failure to purge the 3-inch natural gasline used to supply gas to the vacuum pumproom and allowing the presence of numerous possible ignition sources while a natural gasline was being purged in an enclosed room.

In contrast, the North Carolina Department of Labor found Jacobs performed no work that could have contributed to the accident, did not have knowledge of the hazardous condition, and did not have a scope of work that would have permitted knowledge of the hazardous condition. ConAgra "accepted what the authorities determined" and did not conduct a separate investigation.

Thereafter, 67 individuals and ConAgra's property insurers filed several lawsuits against Jacobs and Pottner; the total settlement demands exceeded $507 million. Shortly after the first suit was filed, Jacobs requested contractual indemnity from ConAgra and ConAgra denied that request and did not participate in the settlements.

A suit brought by seven ConAgra employees was the only case to go to trial. That case proceeded to trial in March 2012 before the Johnston County Civil Superior Court of North Carolina, case No. 09-CV-2330 (referred to as "*Brockington*"). Before trial, ConAgra's counsel wrote to Jacobs:

> Based upon our understanding of the evidence in this case, and the fact that the plaintiffs' claim for punitive damages has survived Jacobs' motion for summary judgment, we believe there is a possibility of a significant jury verdict against Jacobs. As such, ConAgra requests that Jacobs take all reasonable steps to settle these claims.

ConAgra stated that "settlement of plaintiffs' claims by Jacobs would be without prejudice as to any possible indemnity claim that Jacobs' [sic] may have as to ConAgra . . . ."

During the *Brockington* trial, Pottner became ill partway through his testimony, was briefly hospitalized, and returned home to Wisconsin. The court initially declared Pottner unavailable, but later found that Pottner's counsel, who also represented Jacobs, misrepresented the nature or severity of Pottner's illness. The court struck the defendants' answers and confined the jury's deliberations to the issue of damages. The jury awarded the *Brockington* plaintiffs $14.6 million.

The trial court later reinstated Jacobs' answer and granted Jacobs a new trial. Before the second trial, Jacobs settled the suit for $20 million. Jacobs then settled the remaining cases and continued to request indemnification from ConAgra, which ConAgra declined.

Jacobs brought this action against ConAgra in January 2014. Jacobs claimed that it was entitled to the $108.9 million paid to settle the North Carolina cases. Jacobs requested only $17.7 million for the *Brockington* settlement, which represented the amount of the first verdict plus interest since the time of filing.

Prior to trial, ConAgra filed motions to compel Jacobs to provide the amounts paid by Jacobs and Jacobs' insurers toward the settlements. The court overruled ConAgra's various motions and found ConAgra's arguments were not relevant to the "two substantive issues in this case," which it determined were as follows: "(1) whether the [e]xplosion was caused by the alleged negligence of ConAgra and/or others under its control in order to trigger the indemnity provision; and (2) whether the amount of the settlement payments were objectively reasonable."

During the 19-day trial in March 2016, the jury received over 300 exhibits and heard testimony from eight live witnesses and 40 videotaped depositions. The jury returned a special verdict which (1) found that both ConAgra and ESA were negligent, (2) apportioned liability of 70 percent to ConAgra and 30 percent to ESA, and (3) found that ConAgra controlled ESA. The jury further found that Jacobs was not

negligent, that Jacobs had settled the North Carolina lawsuits in good faith, and that the settlement amounts were objectively reasonable. The district court accepted the jury's verdict. ConAgra renewed its motion for directed verdict and moved for judgment notwithstanding the verdict, remittitur, and a new trial. The court denied the motions, ConAgra timely appealed, and we sustained ConAgra's request to bypass review by the Nebraska Court of Appeals.

## II. ASSIGNMENTS OF ERROR

ConAgra assigns, restated, that the district court erred in failing to (1) grant ConAgra's motion for directed verdict or motion for new trial, because Jacobs failed to prove that it had standing as the real party in interest to assert its indemnification claim; (2) order a remittitur, because ConAgra did not waive its workers' compensation immunity; (3) grant ConAgra's motion for directed verdict or motion for new trial, because Jacobs did not establish that its "'losses'" were "'caused by the negligence of ConAgra and/or others under its control,'" as required by the contract; and (4) alter or amend the judgment to remove damages relating to the *Brockington* settlement that were not caused by ConAgra.

## III. STANDARD OF REVIEW

[1,2] Whether a party who commences an action has standing and is therefore the real party in interest presents a jurisdictional issue.[1] When a jurisdictional question does not involve a factual dispute, determination of a jurisdictional issue is a matter of law which requires an appellate court to reach a conclusion independent from the trial court's; however, when a determination rests on factual findings, a trial court's

---

[1] *Countryside Co-op v. Harry A. Koch Co.*, 280 Neb. 795, 790 N.W.2d 873 (2010). See, also, *Applied Underwriters v. S.E.B. Servs. of New York*, 297 Neb. 246, 898 N.W.2d 366 (2017).

decision on the issue will be upheld unless the factual findings concerning jurisdiction are clearly incorrect.[2]

[3,4] In reviewing a trial court's ruling on a motion for directed verdict, an appellate court must treat the motion as an admission of the truth of all competent evidence submitted on behalf of the party against whom the motion is directed; such being the case, the party against whom the motion is directed is entitled to have every controverted fact resolved in its favor and to have the benefit of every inference which can reasonably be deduced from the evidence.[3] A directed verdict is proper at the close of all the evidence only when reasonable minds cannot differ and can draw but one conclusion from the evidence, that is, when an issue should be decided as a matter of law.[4]

[5,6] An appellate court reviews a denial of a motion to alter or amend the judgment for an abuse of discretion.[5] An appellate court reviews a trial court's ruling on a motion for a new trial for an abuse of discretion.[6]

[7-9] Contract interpretation presents a question of law.[7] Whether the jury instructions given by the trial court are correct is a question of law.[8] An appellate court independently reviews questions of law decided by a lower court.[9]

---

[2] *Kugler Co. v. Growth Products Ltd.*, 265 Neb. 505, 658 N.W.2d 40 (2003). See, also, *Skyline Manor v. Rynard*, 288 Neb. 602, 852 N.W.2d 303 (2014).

[3] *Armstrong v. Clarkson College*, 297 Neb. 595, 901 N.W.2d 1 (2017).

[4] *Id.*

[5] *State v. Amaya*, 298 Neb. 70, 902 N.W.2d 675 (2017). See, also, *Armstrong, supra* note 3.

[6] *Facilities Cost Mgmt. Group v. Otoe Cty. Sch. Dist.*, 298 Neb. 777, 906 N.W.2d 1 (2018). See, also, *Armstrong, supra* note 3.

[7] *Cano v. Walker*, 297 Neb. 580, 901 N.W.2d 251 (2017).

[8] *Armstrong, supra* note 3.

[9] *Id.*

[10,11] When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party.[10] A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party.[11]

## IV. ANALYSIS

### 1. Court Did Not Err in Determining Jacobs Is Real Party in Interest

In this case, the trial court issued an order at the pleading stage which found that Jacobs had standing as the real party in interest. The court issued its order contemporaneous with its disposition of competing motions to compel discovery. ConAgra had sought discovery regarding a breakdown of payments made by Jacobs and Jacobs' insurers toward the settlements in the North Carolina cases and argued the evidence was relevant to the issue of whether Jacobs is the real party in interest.

Under ConAgra's theory, Jacobs brought this suit as a subrogee and not an indemnitee. ConAgra asserted that there is a possibility that the settlements entered into by Jacobs were fully funded by Jacobs' insurers or other third parties and that if the evidence showed Jacobs' insurers were fully subrogated, then Jacobs would lack standing to pursue its indemnification claim against ConAgra. The court disposed of this argument by stating, "It is clear that Jacobs has the right to bring this action for the full amount of the settlements against ConAgra even if [its] insurers paid part of the settlements."

The parties continued to litigate the issue, including through posttrial motions filed by ConAgra which reiterated its theory that Jacobs is not the real party in interest. The court held a

---

[10] *ACI Worldwide Corp. v. Baldwin Hackett & Meeks*, 296 Neb. 818, 896 N.W.2d 156 (2017).

[11] *Id.*

hearing and received an affidavit into evidence and issued an order overruling ConAgra's motions, again determining that Jacobs is the real party in interest.

On appeal, ConAgra's primary argument is that Jacobs is not the real party in interest. ConAgra argues that Jacobs failed to prove that it had standing as the real party in interest to seek indemnification and requests that we reverse the judgment below. Jacobs argues the trial court properly found that Jacobs is the real party in interest to pursue its contractual indemnification claim and that Jacobs did not assert claims as a subrogee.

Because the parties focus much of their attention on whether the district court erred in its determination that Jacobs has standing and is the real party in interest, and repeatedly raised the issue to the court through various motions before and after trial, we will discuss the district court's determinations under both a facial and a factual analysis.

[12,13] Nebraska's real party in interest statute provides that "[e]very action shall be prosecuted in the name of the real party in interest . . . ."[12] The purpose of that section is to prevent the prosecution of actions by persons who have no right, title, or interest in the cause.[13] The focus of the real party in interest inquiry is whether the party has standing to sue due to some real interest in the cause of action, or a legal or equitable right, title, or interest in the subject matter of controversy.[14] Standing refers to whether a party had, at the commencement of the litigation, a personal stake in the outcome of the litigation that would warrant a court's or tribunal's exercising its jurisdiction and remedial powers on the party's behalf.[15]

---

[12] Neb. Rev. Stat. § 25-301 (Reissue 2016).

[13] *Cattle Nat. Bank & Trust Co. v. Watson*, 293 Neb. 943, 880 N.W.2d 906 (2016).

[14] *LeRette v. Howard*, 300 Neb. 128, 912 N.W.2d 706 (2018); *Manon v. Orr*, 289 Neb. 484, 856 N.W.2d 106 (2014).

[15] *Applied Underwriters, supra* note 1.

[14] We have said that the question of whether a party who commences an action has standing and is therefore the real party in interest is jurisdictional and that because the requirement of standing is fundamental to a court's exercise of jurisdiction, either a litigant or a court can raise the question of standing at any time.[16]

[15] Because a defect in standing is a defect in subject matter jurisdiction, a challenge to standing is treated as a motion to dismiss for lack of subject matter jurisdiction brought under Neb. Ct. R. Pldg. § 6-1112(b)(1).[17] We have previously explained that the stage of the litigation in which a party claims that its opponent lacks standing affects how a court should dispose of the claim.[18]

[16,17] If the motion is filed at the pleadings stage, it is considered a "facial challenge."[19] In resolving a facial challenge, a court will review the pleadings to determine whether there are sufficient allegations to establish the plaintiff's standing.[20] The court will accept the allegations of the complaint as true and draw all reasonable inferences in favor of the nonmoving party.[21] At the pleadings stage, the standard for determining the sufficiency of a complaint to allege standing is fairly liberal.[22] An appellate court reviews a trial court's decision on a motion to dismiss for lack of subject matter jurisdiction based on a facial attack on the pleadings de novo.[23]

---

[16] See *Stevens v. Downing, Alexander*, 269 Neb. 347, 693 N.W.2d 532 (2005).

[17] *In re Invol. Dissolution of Wiles Bros.*, 285 Neb. 920, 830 N.W.2d 474 (2013).

[18] *Field Club v. Zoning Bd. of Appeals of Omaha*, 283 Neb. 847, 814 N.W.2d 102 (2012).

[19] *Citizens Opposing Indus. Livestock v. Jefferson Cty.*, 274 Neb. 386, 391, 740 N.W.2d 362, 366 (2007).

[20] *Id.*

[21] *Washington v. Conley*, 273 Neb. 908, 734 N.W.2d 306 (2007).

[22] *Applied Underwriters, supra* note 1.

[23] See *Washington, supra* note 21.

[18] If a motion challenging a court's subject matter jurisdiction is filed after the pleadings stage, and the court holds an evidentiary hearing and reviews evidence outside the pleadings, it is considered a "factual challenge."[24] The party opposing the motion must then offer affidavits or other relevant evidence to support its burden of establishing subject matter jurisdiction.[25] Where the trial court's decision on a motion to dismiss for lack of subject matter jurisdiction is based on a factual challenge, the court's factual findings are reviewed under the clearly erroneous standard.[26]

## (a) Facial Challenge

### (i) Background

Jacobs' original complaint asserted a contractual indemnification claim against ConAgra. Jacobs alleged ConAgra's refusal to indemnify breached an agreement which stated in part: "ConAgra will indemnify and release [Jacobs] against all other claims, losses, costs, penalties, damages and/or expenses to the extent caused by the negligence of ConAgra and/or others under its control." Jacobs' referred to the parties' agreement in the complaint and attached a copy of the agreement to the complaint.

Jacobs alleged that it had "incurred and continues to incur claims, losses, costs, penalties, damages and/or expenses . . . in defending against the [l]awsuits." ConAgra filed a motion which argued Jacob's indemnity claims should be dismissed because "there is no allegation that [Jacobs] has paid the claimants any sums for which [ConAgra] should be required to indemnify [Jacobs]."

Prior to a decision on ConAgra's motion to dismiss, Jacobs filed an amended complaint which alleged that it had "incurred claims, losses, costs, penalties, damages and/or expenses

---

[24] *Id*. at 913, 734 N.W.2d at 311.

[25] *Id.*

[26] See *Bohaboj v. Rausch*, 272 Neb. 394, 721 N.W.2d 655 (2006).

. . . in connection with the [l]awsuits" and that it had "noti-fied ConAgra in writing that . . . Jacobs has incurred costs and expenses in connection with the [l]awsuit[s] covered by ConAgra's indemnity obligations, including costs of settle-ment." Jacobs further alleged that "ConAgra's refusal to . . . indemnify Jacobs for settlements, defense fees and any other payments, costs and expenses incurred by Jacobs in defense and resolution of the [l]awsuits, is a breach of S[ubs]ection 10.2 of the Agreement."

ConAgra responded by filing an answer and an amended answer, both of which admitted Jacobs' allegations that it incurred claims, losses, costs, penalties, damages, and/or expenses, but "denie[d] that such expenses and costs were reasonable and allege[d] that those expenses and costs were increased because of the conduct of Jacobs, its employee . . . Pottner and its counsel." ConAgra denied Jacobs' allegation that ConAgra breached an agreement to indemnify, but spe-cifically admitted that "*the expenses incurred by Jacobs* in defending the lawsuits and settling claims were not reasonable and were increased by the conduct of Jacobs, its employee . . . Pottner and its counsel." (Emphasis supplied.)

Thereafter, ConAgra sought discovery regarding Jacobs' damages. ConAgra filed a motion to compel Jacobs to answer interrogatories which sought a breakdown of the amount of money Jacobs and Jacobs' insurers paid toward the settle-ments. ConAgra argued that it had not agreed to indemnify Jacobs' insurers; that amounts paid by Jacobs' insurers were not recoverable; that ConAgra had a right to know whether any of Jacobs' insurers had a subrogation claim against ConAgra, and if so, how much; and that Jacobs was not the real party in interest to bring a claim as a subrogee.

ConAgra relied on *Jelinek v. Nebraska Nat. Gas Co.*,[27] a subrogation case in which we found that homeowners were not the real party in interest to bring property damage claims

---

[27] *Jelinek v. Nebraska Nat. Gas Co.*, 196 Neb. 488, 243 N.W.2d 778 (1976).

against a gas company, because the homeowners' insurer had been fully subrogated. The insureds in *Jelinek* admitted they were "satisfied with the amount paid them by the insurance company," "considered it as settlement in full," and "ma[de] no demand on the defendant for the payment of any additional amount because they [felt] that no additional amount [was] owing to them."[28]

The trial court overruled ConAgra's motion to compel discovery and, sua sponte, without reviewing evidence, found that Jacobs was the real party in interest and that "any breakdown of payments between Jacobs and its insurers or communications and agreements between Jacobs and its insurers is not relevant." The court cited *Krause v. State Farm Mut. Auto. Ins. Co.*[29] for the proposition that when an insurer indemnifies its insured for only part of the loss the insured retains the right of action for the entire loss and stated that a partially subrogated insurer has an equitable interest in the insured's recovery.[30]

The court stated:

> It is clear that Jacobs has the right to bring this action for the full amount of the settlements against ConAgra even if their insurers paid part of the settlements. The insurers would then have a right of action against Jacobs, not ConAgra, in the event that Jacobs received a judgment.

### (ii) Disposition

[19,20] A party to a contract is generally a real party in interest with standing to raise the claim of breach of contract.[31]

---

[28] *Id*. at 490, 243 N.W.2d at 779.

[29] *Krause v. State Farm Mut. Auto. Ins. Co.*, 184 Neb. 588, 169 N.W.2d 601 (1969), *modified on denial of rehearing* 184 Neb. 638, 170 N.W.2d 882.

[30] See John P. Lenich, Nebraska Civil Procedure § 6:3 (2018) (and cases cited therein).

[31] See, *Spanish Oaks, Inc. v. Hy-Vee, Inc.*, 265 Neb. 133, 655 N.W.2d 390 (2003); *Peerless Ins. Co. v. Bukacek*, 211 Neb. 505, 319 N.W.2d 98 (1982).

An indemnity contract is a chose in action because it confers a right to bring a legal action to recover a sum of money from or out of the contract.[32] Under Nebraska law, indemnification is available when one party is compelled to pay money which in justice another ought to pay or has agreed to pay.[33] Nebraska has long held that a claim for indemnity accrues at the time the indemnity claimant suffers loss or damage.[34] We have elaborated that this means that the cause of action accrues when the would-be indemnitee pays the judgment arising from the underlying loss or damage.[35]

In this case, Jacobs brought an express indemnification claim based on ConAgra's refusal to indemnify under an agreement between the parties. Jacobs has standing to raise this claim.

ConAgra argues further discovery could potentially show that as a factual matter, Jacobs has been fully reimbursed for its losses. When a trial court analyzes a facial challenge, however, the court does not make factual findings but accepts the complaint allegations as true and draws all reasonable inferences in favor of the nonmoving party. ConAgra's subrogation argument violates this rule, because it asks this court to construe the parties' allegations in ConAgra's favor. We will not do so, particularly where ConAgra admitted in its pleadings that Jacobs has incurred losses and damages.

[21,22] A judicial admission is a formal act done in the course of judicial proceedings which is a substitute for evidence, thereby waiving or dispensing with the production of evidence by conceding for the purpose of litigation that

---

[32] See *Millard Gutter Co. v. Farm Bureau Prop. & Cas. Ins. Co.*, 295 Neb. 419, 889 N.W.2d 596 (2016).

[33] *Downey v. Western Comm. College Area*, 282 Neb. 970, 808 N.W.2d 839 (2012).

[34] *Dutton-Lainson Co. v. Continental Ins. Co.*, 271 Neb. 810, 716 N.W.2d 87 (2006). See *City of Wood River v. Geer-Melkus Constr. Co.*, 233 Neb. 179, 444 N.W.2d 305 (1989).

[35] *Id.*; *Lyhane v. Durtschi*, 144 Neb. 256, 13 N.W.2d 130 (1944).

the proposition of fact alleged by the opponent is true.[36] While parties cannot confer subject matter jurisdiction upon a judicial tribunal by either acquiescence or consent, nor may subject matter jurisdiction be created by waiver, estoppel, consent, or conduct of the parties, such does not prevent a party from conclusively admitting the truth of an underlying fact required to establish subject matter jurisdiction by judicial admission.[37]

At the time the trial court first determined the issue of the real party in interest, Jacobs' operative complaint alleged that Jacobs had incurred losses and damages in connection with the North Carolina lawsuits. ConAgra admitted that Jacobs incurred losses and damages, but denied that the amounts were reasonable. ConAgra's unequivocal admission that Jacobs has sustained some injury in fact establishes that Jacobs has standing to pursue its express indemnification claim.

[23] ConAgra argues that its admissions are not conclusive because, in responding to Jacobs' claim for breach of the implied covenant of good faith and fair dealing, ConAgra's pleading stated "ConAgra denies all allegations in the Amended Complaint except those specifically admitted above." We agree with Jacobs that ConAgra's general denial does not overcome the admissions made by ConAgra in its specific denials directed toward Jacobs' allegations that it incurred losses and damages. Nebraska has long held that a general denial is not effective where an answer contains specific admissions of facts alleged.[38] Thus, the scope of ConAgra's general denial is limited by the facts admitted in its answer.

The allegations show that in both its answer and its amended answer to Jacobs' amended complaint, ConAgra broadly admitted that Jacobs incurred claims, losses, costs, penalties,

---

[36] *Wisner v. Vandelay Investments*, 300 Neb. 825, ___ N.W.2d ___ (2018).

[37] *Id.*

[38] See, *State Securities Co. v. Corkle*, 191 Neb. 578, 216 N.W.2d 879 (1974); *Johnson v. School Dist. No. 3*, 168 Neb. 547, 96 N.W.2d 623 (1959).

damages, and/or expenses. ConAgra did not raise the real party in interest issue as an affirmative defense until responding to Jacobs' second amended complaint filed after the court had already determined that Jacobs had standing and was the real party in interest. Even under a de novo facial review, ConAgra's affirmative defense allegation is insufficient, because it stated that Jacobs is not the real party in interest "to the extent the claims it asserts are as a subrogee."

ConAgra's admissions establish that Jacobs' express indemnity claim had accrued and that Jacobs sought to invoke the court's jurisdiction in order to remedy ConAgra's refusal to indemnify. This is sufficient to establish that Jacobs has standing and is the real party in interest with respect to its express indemnification claim and to show that the pleadings do not support ConAgra's theory that Jacobs asserted claims as a subrogee.

[24] We have said the primary purpose of the real party in interest requirement is to protect the defendant from the risk of multiple litigation.[39] ConAgra has not advanced a persuasive argument that it will be forced to defend claims brought by multiple parties. The trial court addressed this aspect of ConAgra's argument by explaining that Jacobs' insurers would have a right to recovery against Jacobs and not ConAgra.

When the indemnity paid by the insurer covers only part of the loss, the right of action remains in the insured for the entire loss.[40] This rule is "'founded on the principle that the wrongful act was single and indivisible, and gives rise to but one liability. *Upon this theory the splitting of causes of action is avoided and the wrongdoer is not subjected to a multiplicity*

---

[39] See, *Peerless Ins. Co., supra* note 31; *Redding v. Gibbs*, 203 Neb. 727, 280 N.W.2d 53 (1979). See, also, Lenich, *supra* note 30, § 6:9.

[40] See, *Schmidt v. Henke*, 192 Neb. 408, 222 N.W.2d 114 (1974); *Krause, supra* note 29; *Shiman Bros. & Co. v. Nebraska National Hotel Co.*, 143 Neb. 404, 9 N.W.2d 807 (1943).

*of suits*.'"[41] We have recognized one exception to this rule, not applicable here, where a tort-feasor or the tort-feasor's insurer, with notice of an insurer's subrogation claim, procures a release by settling with the insured.[42]

ConAgra's theory is not based on pleading allegations and therefore is not persuasive under a facial challenge. Accepting the parties' allegations as true and viewing reasonable inferences in Jacobs' favor, Jacobs incurred some amount of damages as a result of ConAgra's refusal to indemnify, ConAgra admitted this, and there are no contrary factual allegations stating that Jacobs' damages have been fully reimbursed. Under the rule from *Krause*, Jacobs has a right to bring an action for the full amount of its damages. The trial court was correct in determining that ConAgra was not forced to defend claims brought by multiple parties.

ConAgra also suggests Jacobs' claim may be barred by Nebraska's antisubrogation rule. Under the antisubrogation rule, no right of subrogation can arise in favor of an insurer against its own insured or coinsured for a risk covered by the policy, even if the insured is a negligent wrongdoer.[43] To allow subrogation under such circumstances would permit an insurer, in effect, to avoid the very coverage which its insured purchased.[44] For example, a fully subrogated insurer of Jacobs cannot assert a subrogation claim against Jacobs. Here, ConAgra's antisubrogation argument asks this court to assume that the real party in interest is a fully subrogated insurer of Jacobs which also happens to be an insurer of ConAgra for the same risks. This argument is not supported by the pleadings.

---

[41] *Krause, supra* note 29, 184 Neb. at 593, 169 N.W.2d at 604 (emphasis in original).

[42] *Milbank Ins. Co. v. Henry*, 232 Neb. 418, 441 N.W.2d 143 (1989).

[43] *SFI Ltd. Partnership 8 v. Carroll*, 288 Neb. 698, 851 N.W.2d 82 (2014); *Buckeye State Mut. Ins. Co. v. Humlicek*, 284 Neb. 463, 822 N.W.2d 351 (2012).

[44] *Id.*

Based on the pleadings, we find Jacobs, and not ConAgra's insurer, is the real party in interest and is asserting an indemnification claim and not a subrogation claim. We therefore reject ConAgra's antisubrogation argument.

As noted, after the trial court determined that Jacobs was the real party in interest, ConAgra continued to press the issue through pretrial motions, objections at trial, and posttrial motions. We discuss below ConAgra's factual challenge and further explain why the trial court did not err in determining that Jacobs is the real party in interest.

## (b) Factual Challenge

### (i) Background

Before trial, ConAgra filed another motion to compel discovery of the amounts that Jacobs and its insurers paid to settle the North Carolina lawsuits. The court issued an order which maintained its prior ruling that these items were not discoverable. The court again rejected the argument that Jacobs brought its claim as a subrogee. The court's order stated that "the Court is bound by the Agreement, which contains an express indemnity contract between the parties. Jacobs is suing for ConAgra's alleged breach of the Agreement, not for subrogation."

ConAgra revived the real party in interest issue at trial when it moved for a directed verdict at the close of Jacobs' evidence. ConAgra argued that Jacobs had not offered evidence that it actually made payments to the North Carolina plaintiffs. The court denied the motion, and after trial, ConAgra renewed its motion for directed verdict and moved for judgment notwithstanding the verdict and a new trial. The court issued a written order which explained its reasons for overruling ConAgra's motions.

The court clarified that it interpreted ConAgra's argument as an objection to Jacobs' damages, rather than solely an argument about standing, and explained that ConAgra's arguments contravened the collateral source rule. The court rejected

ConAgra's contention that the collateral source rule did not apply in this breach of contract action premised upon negligent conduct.

[25] Under the collateral source rule, the fact that the party seeking recovery has been wholly or partially indemnified for a loss by insurance or otherwise cannot be set up by the wrongdoer in mitigation of damages.[45] The theory underlying this rule is to prevent a tort-feasor from escaping liability because of the act of a third party, even if a possibility exists that the plaintiff may be compensated twice.[46] The majority of courts do not apply the collateral source rule to pure breach-of-contract actions.[47] However, in cases where the breach of contract is of a tortious character, the collateral source rule prevents unjust enrichment of the breaching party.[48]

Here, the court found that the contract expressly incorporated tort principles of negligence and found the collateral source rule applied. The court cited to *Countryside Co-op v. Harry A. Koch Co.*[49] and found that the damages Jacobs sought to recover from ConAgra, a tort-feasor, could not be diminished by losses that were wholly or partially indemnified by insurance or another collateral source. ConAgra did not assign as error this aspect of the court's ruling, and we do not find plain error based on the facts of this case, given that the other source of payment alleged is insurance, which specifically invokes the collateral source rule.[50]

---

[45] *Strasburg v. Union Pacific RR. Co.*, 286 Neb. 743, 839 N.W.2d 273 (2013).

[46] *Id.*

[47] See *Midland Mut. Life Ins. v. Mercy Clinics*, 579 N.W.2d 823 (Iowa 1998) (citing cases).

[48] See *John Munic Enterprises, Inc. v. Laos*, 235 Ariz. 12, 326 P.3d 279 (Ariz. App. 2014).

[49] *Countryside Co-op, supra* note 1.

[50] See *Hueink v. Collins*, 181 Neb. 195, 147 N.W.2d 508 (1966).

In addressing ConAgra's reliance on *Jelinek*,[51] the court noted that the insureds in *Jelinek* were satisfied with payments made by their insurer and made no demand on the defendant for payment. The court also referenced *Schmidt v. Henke*,[52] a similar case cited in *Jelinek*, in which the insured had released its claims against the defendant. The court distinguished both *Jelinek* and *Schmidt* from the present case and made a factual finding that "Jacobs has made a demand on ConAgra for payment and has not expressly released any claims against ConAgra." The court again found that Jacobs was the real party in interest.

### (ii) Disposition

ConAgra argues that on this record, there is no way to tell whether this case falls on the *Jelinek* or *Krause* side of the line. Jacobs argues the record supports the district court's finding that Jacobs is the real party in interest.

At trial, Jacobs introduced evidence, with information about the payor redacted, that wire transfers were made to pay the various settlements. The settlement documents stated that "JACOBS and/or its insurers" will pay. Jacobs' vice president of global litigation testified that all of the settlements have been paid, but did not testify who made the payments. Jacobs' expert testified that he was asked to "review the settlements that were paid by Jacobs." ConAgra objected and argued if the witness' answer were allowed to stand that would open the door for ConAgra to inquire into the amounts paid by Jacobs and its insurers. The court responded that "Jacobs is the real party in interest" and struck the witness' answer so that the jury would not hear evidence of collateral source payments.

After trial, ConAgra moved for judgment notwithstanding the verdict and a new trial, in part based on its argument that Jacobs failed to establish standing. Citing *Citizens Opposing*

---

[51] *Jelinek, supra* note 27.

[52] *Schmidt, supra* note 40.

*Indus. Livestock v. Jefferson Cty.*,[53] Jacobs requested an evidentiary hearing. In *Citizens Opposing Indus. Livestock*, we held that where a motion to dismiss for lack of subject matter jurisdiction due to lack of standing was raised for the first time after trial, the motion was considered a factual challenge and the trial court was required to hold an evidentiary hearing to give a plaintiff the opportunity to offer evidence on the standing issue.

The court granted Jacobs' request, and Jacobs offered its insurance policies into evidence. The policies showed that Jacobs had deductible obligations and a 10-percent copayment obligation for all sums that exceeded $7.5 million. Although there was no direct evidence that Jacobs paid these obligations, there was also no evidence that Jacobs' insurers waived these obligations. ConAgra did not offer any evidence to support its theory and did not assign error to the district court's decisions regarding discovery. ConAgra also did not assign error as to the court's factual findings and clarified that "[t]his appeal involves only questions of law . . . ."[54] Jacobs' insurance policies therefore established circumstantial evidence that Jacobs paid a share of the $108.9 million in settlement payments.

[26,27] Circumstantial evidence is not inherently less probative than direct evidence, and a fact proved by circumstantial evidence is nonetheless a proven fact.[55] A finder of fact may draw reasonable inferences from the facts and circumstances proved.[56] Based on the court's specific findings that "Jacobs has made a demand on ConAgra for payment and has not expressly released any claims against ConAgra," and the insurance policies in evidence, we find the trial court's factual determination that Jacobs had standing and was the real party

---

[53] *Citizens Opposing Indus. Livestock, supra* note 19.

[54] Brief for appellant at 4.

[55] See *State v. Pierce*, 248 Neb. 536, 537 N.W.2d 323 (1995).

[56] *In re Interest of Elainna R.*, 298 Neb. 436, 904 N.W.2d 689 (2017).

in interest was not clearly erroneous. There is evidence in the record to support the district court's finding that Jacobs had standing to pursue its express indemnity claim and that ConAgra will not be subjected to multiple litigation.

Although ConAgra challenged Jacobs' standing before the end of trial, unlike the defendant in *Citizens Opposing Indus. Livestock*, ConAgra was not prejudiced by the court's decision to hold a posttrial evidentiary hearing. ConAgra was on notice of the court's ruling on standing and objected at trial whenever a witness for Jacobs testified that Jacobs had paid the settlements. The court's factual determination regarding Jacobs' standing was merely a consistent supplement to its determination at the pleading stage.

Under both a facial and a factual analysis, this assignment of error is without merit.

### 2. Court Did Not Err in Finding ConAgra's Workers' Compensation Immunity Inapplicable

ConAgra asserts the trial court erred in finding that Jacobs could be indemnified for settlements made to ConAgra employees, because the indemnification agreement with Jacobs did not explicitly waive ConAgra's workers' compensation immunity. Jacobs argues that ConAgra agreed to indemnify Jacobs for claims and losses incurred by ConAgra employees and that the agreement is all that is required under Nebraska law. We agree with Jacobs that ConAgra misconstrues our precedent regarding the relationship between the Nebraska Workers' Compensation Act (NWCA), Neb. Rev. Stat. § 48-101 et seq. (Reissue 2010, Cum. Supp. 2016 & Supp. 2017), and an employer's liability based on express indemnification of third parties.

[28,29] An indemnity agreement is a contract to be construed according to the principles generally applied in construction or interpretation of other contracts.[57] A contract must

---

[57] *Kuhn v. Wells Fargo Bank of Neb.*, 278 Neb. 428, 771 N.W.2d 103 (2009).

receive a reasonable construction and must be construed as a whole, and if possible, effect must be given to every part of the contract.[58]

### (a) Parties' Contract Covered Indemnification of Claims and Losses Incurred by ConAgra Employees

Subsection 10.1 of the contract provides that "[Jacobs] shall indemnify . . . ConAgra . . . against each and every claim, loss, cost, penalty, damage, or expense . . . suffered or incurred by any third parties, employees of ConAgra and employees of [Jacobs]." Subsection 10.2 provides that "ConAgra will indemnify and release [Jacobs] against all other claims, losses, costs, penalties, damages and/or expenses to the extent caused by the negligence of ConAgra and/or others under its control."

The district court explained that "[w]hen Section 10 of the Agreement is viewed as a whole, there is no question that S[ubs]ection 10.2 is an express contract in which ConAgra agreed to indemnify Jacobs against claims by ConAgra employees." We agree the meaning of section 10 becomes clear once subsections 10.1 and 10.2 are construed together.

Subsections 10.1 and 10.2 are reciprocal indemnification provisions. Subsection 10.1 states Jacobs shall indemnify ConAgra "against each and every claim, loss, cost, penalty, damage, or expense" incurred by "employees of ConAgra," and subsection 10.2 states that ConAgra will indemnify Jacobs "against all other claims, losses, costs, penalties, damages and/or expenses." In addition, subsection 10.1 states that Jacobs' "obligations hereunder shall be limited to the extent caused by the negligent acts, errors or omissions of [Jacobs]," and subsection 10.2 states that Jacobs' liability "is specifically limited as provided herein."

Reading section 10 as a whole and in context, the term "all other claims" as provided in subsection 10.2 must refer

---

[58] *Id.*

to "all other claims" within section 10. Because subsection 10.1 plainly provides for indemnification of claims brought by employees of ConAgra, when read together, subsections 10.1 and 10.2 provide a clear indication that ConAgra agreed to indemnify Jacobs for claims and losses incurred by employees of ConAgra "to the extent caused by the negligence of ConAgra and/or others under its control." Thus, the district court correctly interpreted the parties' contract to obligate ConAgra to indemnify claims and losses incurred by ConAgra employees caused by ConAgra's negligence.

### (b) NWCA Does Not Immunize ConAgra From Indemnifying Jacobs for Losses Sustained by ConAgra Employees

Section 48-148 of the NWCA provides that if an employee's injury arises out of and in the course of employment, the employee's exclusive remedy is against the employer for workers' compensation.[59] The NWCA imposes liability on the employer without fault, and in return, shields the employer from tort actions.[60] But nothing in Nebraska law or public policy prevents an employer from indemnifying a third party for losses paid to the indemnitor's employee.[61]

[30] We held in *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*[62] that when an employer, liable to an employee under the NWCA, agrees to indemnify a third party for a loss sustained as the result of the third party's payment to the indemnitor's employee, the employer's exclusion from liability accorded by the NWCA does not preclude the third

---

[59] *Bennett v. Saint Elizabeth Health Sys.*, 273 Neb. 300, 729 N.W.2d 80 (2007).

[60] *Estate of Teague v. Crossroads Co-op Assn.*, 286 Neb. 1, 834 N.W.2d 236 (2013).

[61] See, *Petznick v. United States*, 575 F. Supp. 698 (D. Neb. 1983); *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988).

[62] *Union Pacific RR. Co., supra* note 61.

party's action to enforce the indemnity agreement with the indemnitor-employer.[63]

ConAgra argues that Jacobs' claim is based on a general indemnification provision and that ConAgra cannot be deprived of the protections of the NWCA absent an affirmative waiver of workers' compensation immunity. Our precedent, however, does not recognize the rule ConAgra suggests, and we have taken the opposite approach in analyzing indemnification agreements, finding a waiver of workers' compensation immunity where an indemnity provision fails to include language stating that an employer has not waived immunity.[64]

In interpreting the effectiveness of the indemnity agreement in *Union Pacific RR. Co.*, we noted that the "agreement contains no specific provision or language which excludes, exempts, or exonerates [the employer] from liability for indemnification or contribution as a contractual duty,"[65] and concluded that the employer remained liable for indemnification or contribution based on the railroad's settlement with the employer's employee. We found that to conclude otherwise would rewrite the agreement by adding a provision to preserve the employer's workers' compensation immunity.[66]

Similarly, in *Oddo v. Speedway Scaffold Co.*,[67] we cited *Union Pacific RR. Co.* and found the NWCA did not bar a contractor's liability under an indemnification agreement by reasoning that the agreement "contains no specific provision or language which excludes, exempts, or exonerates Contractor from indemnification as a contractual duty."[68]

---

[63] See, also, *Harsh International v. Monfort Indus.*, 266 Neb. 82, 662 N.W.2d 574 (2003).

[64] *Union Pacific RR. Co., supra* note 61.

[65] *Id.* at 169, 425 N.W.2d at 879.

[66] *Id.*

[67] *Oddo v. Speedway Scaffold Co.*, 233 Neb. 1, 443 N.W.2d 596 (1989).

[68] *Id.* at 9, 443 N.W.2d at 602.

The same analysis applies here. The agreement between ConAgra and Jacobs includes indemnification obligations for claims and losses incurred by ConAgra employees and does not express any exclusions in favor of ConAgra or Jacobs based on workers' compensation immunity. Therefore, ConAgra's contractual liability remains.

ConAgra urges a different result based on our decision in *Harsh International v. Monfort Indus.*[69] In *Harsh International*, the district court dismissed a petition brought by a manufacturer which asserted a contribution claim against an employer, after settling claims brought by injured employees. We affirmed the district court's dismissal of the petition. In doing so, we rejected the manufacturer's implied indemnity claim and found the employer's liability was limited to the employee, absent an express indemnity contract or an implied indemnification claim involving a special relationship.[70] In dicta, we contrasted a contractual indemnity claim from an implied indemnity claim by stating that "[u]nder an express contract of indemnity, an employer has explicitly agreed to reimburse a third party for payment to an injured employee."[71] We did not hold, as ConAgra argues, that an employer who enters an indemnity agreement must affirmatively waive its workers' compensation immunity in order to be subject to indemnity claims brought by third parties based on employees' losses.

Rather, we have consistently held that an indemnification agreement is construed according to general contract principles.[72] ConAgra may be applying the different rule, not applicable here, that an indemnitee shall not be indemnified

---

[69] *Harsh International, supra* note 63.

[70] *Id.*

[71] *Id*. at 88, 662 N.W.2d at 580.

[72] See, *Kuhn, supra* note 57; *Oddo, supra* note 67; *Union Pacific RR. Co., supra* note 61. See, also, *Woodmen of the World Life Ins. Soc. v. Peter Kiewit Sons' Co.*, 196 Neb. 158, 241 N.W.2d 674 (1976); *Currency Services, Inc. v. Passer*, 178 Neb. 286, 133 N.W.2d 19 (1965).

for a loss occasioned by his or her own negligence unless the language of the contract affirmatively expresses an intent to indemnify for such loss.[73] Here, Jacobs seeks indemnification for claims and losses caused by ConAgra's negligence and not Jacobs' own negligence. The NWCA does not bar ConAgra's liability to Jacobs for settlements made with ConAgra employees. This assignment of error is without merit.

### 3. JACOBS ESTABLISHED JURY ISSUE THAT CONAGRA BREACHED CONTRACT

ConAgra assigns, restated, that the district court erred in declining to direct a verdict in favor of ConAgra or grant a new trial based on the argument that Jacobs failed to establish ConAgra breached the contract.

In order to establish that ConAgra's refusal to indemnify breached the contract at issue, Jacobs was required to satisfy two components: (1) that Jacobs incurred claims, losses, costs, penalties, damages, and/or expenses and (2) that Jacobs' claims, losses, costs, penalties, damages, and/or expenses were caused by the negligence of ConAgra and/or others under its control. ConAgra asserts Jacobs failed to prove both aspects as a matter of law. We find no merit to this assignment of error.

### (a) Jacobs Established Sufficient Evidence of Its Claims, Losses, or Damages to Submit Issue to Jury

ConAgra argues Jacobs did not establish a triable claim that ConAgra caused Jacobs' losses. ConAgra relies on an instruction given by the district court regarding Jacobs' damages which stated that "Jacobs is entitled to indemnification for all objectively reasonable settlements of the North Carolina lawsuits to the extent that *the explosion and/or the resulting*

---

[73] *Kuhn, supra* note 57.

*injuries and damages to the North Carolina plaintiffs* were caused by the negligence of ConAgra and/or others under its control." (Emphasis supplied.) ConAgra argues the court erred by instructing the jury that the losses at issue were the injuries and damages from the underlying explosion, as opposed to Jacobs' settlement payments. ConAgra argues that it was prejudiced, because the court's instructions and special verdict form deprived ConAgra of the ability to argue that the settlements were caused by the efficient intervening cause of defense counsel's performance during the *Brockington* trial.

[31-33] A litigant is entitled to have the jury instructed upon only those theories of the case which are presented by the pleadings and which are supported by competent evidence.[74] If the instructions given, which are taken as a whole, correctly state the law, are not misleading, and adequately cover the issues submissible to a jury, there is no prejudicial error concerning the instructions and necessitating a reversal.[75] Where a party has sustained the burden and expense of trial and has succeeded in securing a verdict on the facts in issue, that party has the right to keep the benefit of the verdict unless there is prejudicial error in the proceedings by which it was secured.[76]

ConAgra claims it was prevented from arguing that the actions of defense counsel during the *Brockington* trial were an unforeseeable efficient intervening cause that negated its liability. ConAgra points to language from the court's damages instruction provided above, and the special verdict form, which asked the jury: "Did ConAgra's negligence proximately cause the explosion and/or the resulting injuries and damages to the North Carolina plaintiffs?" and "Were the settlement amounts that Jacobs is seeking in all of the North Carolina lawsuits objectively reasonable?" In evaluating ConAgra's argument, we cannot view these instructions in artificial

---

[74] *Rodriguez v. Surgical Assocs.*, 298 Neb. 573, 905 N.W.2d 247 (2018).

[75] *Id.*; *InterCall, Inc. v. Egenera, Inc.*, 284 Neb. 801, 824 N.W.2d 12 (2012).

[76] *Wolfe v. Abraham*, 244 Neb. 337, 506 N.W.2d 692 (1993).

isolation but must consider the instructions provided to the jury as a whole.[77]

Beginning with the court's statement of the case instruction, jury instruction No. 2, the court explained that Jacobs' claim was not confined to only its "losses" as ConAgra argues on appeal. The court provided the language of subsection 10.2 to demonstrate that Jacobs sought to recover for "claims, losses, costs, penalties, damages and/or expenses." The court instructed the jury that it had determined that subsection 10.2 required ConAgra to indemnify Jacobs "for *claims* to the extent the Garner plant explosion and/or the resulting injuries and damages were caused by the negligence of ConAgra and/or others under ConAgra's control." (Emphasis supplied.)

The court then provided a breach of contract instruction, jury instruction No. 11. The instruction provided, "For Jacobs to recover on its claim for breach of contract against ConAgra, Jacobs must prove, by the greater weight of the evidence . . . [t]hat ConAgra's breach of contract was a proximate cause of some damage to Jacobs." Jury instruction No. 12 stated, in part, "You must determine whether ConAgra owes a contractual duty to indemnify Jacobs for any amounts paid to settle the North Carolina lawsuits." Thus, the court instructed the jury to consider whether ConAgra breached a contractual duty to indemnify Jacobs for claims, whether ConAgra's breach was a proximate cause of damage to Jacobs, and whether ConAgra was responsible to Jacobs for amounts paid to settle the lawsuits.

The court also provided a general proximate cause instruction, jury instruction No. 14, which stated, "A proximate cause is a cause [that] produces a result in a natural and continuous sequence, and without which the result would not have occurred." And, near the beginning of jury instruction No. 21, prior to the portion quoted by ConAgra, the court instructed the jury that "Jacobs is seeking as damages amounts it agreed to settle the claims of the North Carolina plaintiffs."

---

[77] See *State v. Sellers*, 279 Neb. 220, 777 N.W.2d 779 (2010).

Although in isolated parts of the instructions the district court could have more precisely stated that under subsection 10.2, Jacobs sought to prove that ConAgra's negligence caused the settlements rather than the North Carolina plaintiffs' personal injuries, we certainly cannot say the failure to do so under the circumstances of this case impacted the fairness of trial. As noted, the scope of the indemnification provision under subsection 10.2 includes claims and damages, in addition to losses. All of the claims in this case were for injuries caused by the explosion, ConAgra was liable for claims under the indemnity provision, the court made the jury aware that Jacobs was seeking damages based on the settlement figures, and the court provided proximate cause instructions. Taken together as a whole, the instructions asked the jury to determine whether ConAgra proximately caused Jacobs' settlements.

ConAgra's request for an efficient intervening cause instruction was not supported by the evidence. An efficient intervening cause is the new and independent conduct of a third person, which itself is a proximate cause of the injury in question and breaks the causal connection between the original conduct and the injury.[78] The evidence showed the North Carolina plaintiffs brought their claims against Jacobs as a result of the explosion.

ConAgra criticized the outcome of the *Brockington* trial and sought to argue that the settlement was caused by the performance of defense counsel. We agree with the district court which rejected this argument by stating that the misconduct of Jacobs' attorney in the *Brockington* lawsuit "in no way intervened to cause the injuries resulting from the [e]xplosion at the Garner Plant." And, even taking ConAgra's argument at face value, ConAgra failed to prove prejudice, because it never argued what the amount of the *Brockington* settlement would have been had the misconduct not occurred. ConAgra never provided what it claimed to be the appropriate settlement value and, in fact, told the jury during closing

---

[78] *Latzel v. Bartek*, 288 Neb. 1, 846 N.W.2d 153 (2014).

argument that the value could be $14.4 million, $17.7 million, or $20 million.

Jacobs established a triable issue that ConAgra caused Jacobs' claims, losses, and damages. The evidence did not support the use of an efficient intervening cause instruction regarding performance of defense counsel at trial. ConAgra was not prejudiced. This argument is without merit.

### (b) Jacobs Established Triable Issue That Its Claims, Losses, or Damages Were Caused by ConAgra or Someone Under ConAgra's Control

ConAgra raises three additional arguments which claim that it cannot be held liable for the explosion as a matter of law. First, ConAgra argues that it did not cause Jacobs' claims, losses, or damages, because Poppe's removal of the cap on the 2-inch gasline broke the causal chain between ConAgra and the explosion as a matter of law. Second, ConAgra argues that Poppe and ESA were not under ConAgra's control, and relatedly, third, that the indemnification provision is inapplicable under the circumstances of this case.

Jacobs contends that sufficient evidence was presented that ConAgra's employees knew of the significant danger posed by Poppe's action, but did nothing to stop him. In addition, Jacobs contends that there was sufficient evidence submitted to the jury of ConAgra's control over Poppe and ESA. In the alternative, Jacobs contends that ConAgra had a nondelegable duty to protect its employees with a safe working environment free of deadly hazards.

We agree with Jacobs that there was sufficient evidence to support the jury's determination that Poppe's actions did not breach the causal chain as a matter of law. In addition, we find there was evidence supporting the jury's determination that Poppe and ESA were under ConAgra's control. With regard to the nondelegable duty doctrine, we note that this issue concerns an alternative and independent theory of ConAgra's liability based on negligence at common law, and we agree

with the statement from ConAgra's brief that "[t]here is no basis for reading this contract to require [common-law tort] liability."[79] However, we conclude there is evidence to support the contract theory.

### (i) There Was Evidence to Support Jury's Finding ConAgra's Negligence Was Proximate Cause of Jacobs' Damages

[34,35] A party is only answerable for the natural, probable, reasonable, and proximate consequences of his acts; and where some new efficient cause intervenes, not set in motion by him, and not connected with but independent of his acts and not flowing therefrom, and not reasonably in the nature of things to be contemplated or foreseen by him, and produced the injury, it is the dominant cause.[80] Because the extent of foreseeable risk depends on the specific facts of the case, courts should leave such determinations to the trier of fact unless no reasonable person could differ on the matter.[81]

[36] A civil verdict will not be set aside where evidence is in conflict or where reasonable minds may reach different conclusions or inferences, as it is within the jury's province to decide issues of fact.[82]

The district court found "there [was] evidence that ConAgra employees knew of the significant dangers posed by . . . Poppe's action, and did nothing to stop him" and that its judgment should not be substituted for the jury's. We have the same view. There was competent evidence to sustain the jury's determination that ConAgra was a proximate cause of Jacobs' damages.

Even if Poppe's decision to unscrew the cap to the 2-inch line was "crazy" and was the final act prior to the explosion,

---

[79] Brief for appellant at 50.

[80] *Welsh v. Zuck*, 192 Neb. 1, 218 N.W.2d 236 (1974).

[81] See, *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016); *A.W. v. Lancaster Cty. Sch. Dist. 0001*, 280 Neb. 205, 784 N.W.2d 907 (2010).

[82] *InterCall, Inc., supra* note 75.

there was evidence to support a jury finding that Poppe's decision was either (1) set in motion by ConAgra's negligence or (2) was connected with or flowed from ConAgra's negligence, and was not independent thereof. The evidence showed that ConAgra breached the standard of care in the planning and execution of its water heater project and that Poppe's actions occurred because of a series of errors committed by ConAgra.

ConAgra's worksite hazard assessment plan described the line-break procedure and the need to address the risk of explosion. Puff was responsible for the line-break procedure, but did not follow the written procedure and did not train Poppe in the procedure resulting in the gasline to the water heater's not being purged prior to the commissioning. ConAgra allowed Poppe to attempt to light the water heater for 3½ hours, even after ConAgra employees witnessed Poppe crack the pilotline and release gas into the room. Puff smelled gas and did not tell Poppe that the line had not been purged, and he allowed Poppe to continue to purge inside even though Puff had been trained to purge outdoors and had already purged one of the lines outdoors 5 days prior. Puff testified that the gas smell eventually grew stronger and that he temporarily stopped Poppe from working due to his concern about whether the gas meter was functioning properly. Puff left the scene and admitted that he should not have left Poppe unsupervised. Puff admitted he would not have allowed Poppe to open the cap on the gasline if he had stayed. Had Puff purged the line on June 4, 2009, the explosion may have been avoided.

In addition, an SPA was never created for ConAgra's water heater, and ConAgra admitted that, if implemented, an SPA would have prevented Poppe from venting in the pumproom, and thus prevented the explosion. Further, ConAgra failed to comply with the fire prevention plan, which prohibited the handling of natural gas "where vapors are prevented from reaching ignition sources."

[37] Even if the jury determined that Poppe's decision to remove the gas cap was a proximate cause of the explosion, the record supports the verdict, because Jacobs had to show that ConAgra was only a proximate cause of Jacobs' damages, and not the sole proximate cause. Jury instruction No. 11, discussed above, stated that Jacobs was required to prove that "ConAgra's breach of contract was *a* proximate cause of some damage to Jacobs." (Emphasis supplied.) Even ConAgra's refused instruction stated that Jacobs must prove that "ConAgra's negligence was *a* proximate cause of Jacobs' losses." (Emphasis supplied.) Where separate and independent acts of negligence by different persons combine to produce a single injury, each participant is liable for the damage, although one of them alone could not have caused the result.[83] The record provided the jury a sufficient basis from which to conclude that Poppe's decision to remove the gas cap was not the single, independent cause of Jacobs' damages. ConAgra's argument that Poppe broke the causal chain as a matter of law is without merit.

### (ii) Jacobs Established Triable Issue Regarding ConAgra's Control of ESA Under Contract

ConAgra asserts that it did not exercise control over ESA, an independent contractor, and was entitled to a directed verdict based on this issue. As noted above, ConAgra asserted that the contract does not incorporate common-law nondelegable duties. ConAgra also argues that as a matter of law, Jacobs' claims did not satisfy the general rule discussed in *Gayton v. Wal-Mart*[84] that "one who employs an independent contractor is not liable for physical harm caused to another by the acts or omissions of the contractor or its servants."

Jacobs argues that ConAgra had control over ESA's ability to purge the gasline and that Puff and Roberson exercised

---

[83] *Sacco v. Carothers*, 253 Neb. 9, 567 N.W.2d 299 (1997).

[84] *Gaytan v. Wal-Mart*, 289 Neb. 49, 57, 853 N.W.2d 181, 192 (2014).

control over Poppe's work. Jacobs further argues that sufficient evidence was presented to satisfy the three-part test from *Gaytan* to establish that ConAgra had control over Poppe and ESA.

In *Gaytan*, we held that in order to impose liability on a general contractor for injury to a subcontractor's employee, the general contractor must have (1) supervised the work that caused the injury to the employee, (2) actual or constructive knowledge of the danger which ultimately caused the injury, and (3) the opportunity to prevent the injury.

On the question of ConAgra's "control" of ESA, we give primary consideration to Jacobs' contract theory. Under Jacobs' theory of contractual indemnification, we interpret the contractual term "under [ConAgra's] control" according to its plain meaning and context. "Control" is defined as "the power or authority to manage, direct, or oversee."[85] To the extent ConAgra's arguments can be interpreted as claiming that it did not exercise authority over ESA, we reject those arguments based on the record in this case.

Drawing every reasonable inference from the evidence in Jacobs' favor, there was evidence that Puff and his team had control over the line-break procedure and the purging of the natural gasline and that ConAgra should have required ESA to follow this procedure to comply with industry standards. There was evidence that in accordance with ConAgra policy, Puff and Roberson supervised Poppe's work and had the ability to train and instruct Poppe and stop his work if needed. There was also evidence that ConAgra knew Poppe was releasing gas into an enclosed room, that Roberson brought unrated temporary lighting into the room, and that ConAgra could have had Poppe purge outside, discontinue the commissioning based on an inoperative gas meter, or evacuate the building. Thus, there was competent evidence that ConAgra exercised supervisory authority over ESA, that ConAgra had actual or

---

[85] Black's Law Dictionary 403 (10th ed. 2014).

constructive knowledge of the danger which ultimately caused the injuries, and that ConAgra had the opportunity to prevent the injuries. Therefore, ESA was under ConAgra's control within the meaning of the indemnification provision. This assignment of error is without merit.

### 4. Court Did Not Err in Declining to Reduce Jury's Award of Damages

ConAgra assigns error to the trial court's decision not to reduce the amount of damages awarded by the jury. ConAgra argues that we should reduce the judgment by the amount of the *Brockington* settlement, because the $17.7 million figure was arbitrary.

[38-40] The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved.[86] The law is well established that where a verdict is excessive, but not so much as to indicate passion or prejudice on the part of the jury, the error may be corrected by remittitur, if the excess can be estimated with reasonable certainty.[87] A request for remittitur is generally made in lieu of a request for a new trial.[88] An appellate court should order remittitur only when the award is contrary to all reason.[89]

ConAgra argues there was no evidentiary basis upon which a jury could value the *Brockington* settlement at $17.7 million. However, Jacobs' expert, a North Carolina trial lawyer with over 40 years of experience, testified that the $17.7 million

---

[86] *Dutton-Lainson Co. v. Continental Ins. Co.*, 279 Neb. 365, 778 N.W.2d 433 (2010).

[87] *Barbour v. Jenson Commercial Distributing Co.*, 212 Neb. 512, 323 N.W.2d 824 (1982).

[88] See, *Crewdson v. Burlington Northern RR. Co.*, 234 Neb. 631, 452 N.W.2d 270 (1990); *Barbour, supra* note 87; *Pearse v. Loup River Public Power District*, 137 Neb. 611, 290 N.W. 474 (1940).

[89] *Holmes v. Crossroads Joint Venture*, 262 Neb. 98, 629 N.W.2d 511 (2001).

figure represented the amount of the first verdict, $14.6 million, plus prejudgment interest under North Carolina law. He compared the settlement amounts to what would be fair compensation for the injuries suffered and opined that the settlement amounts were objectively reasonable.

Jacobs' expert witness' opinion was based on an objective 10-factor analysis, which considered: venue, nature and magnitude of disaster, horrific nature of the injuries, ratio of demands to settlements, target defendants, ConAgra's exposure, and comparable verdicts and settlements. In demonstrating the objective reasonableness of the *Brockington* settlement, he testified that the *Brockington* venue was "plaintiff-friendly" and that Jacobs was a target defendant as an out-of-state "faceless" corporation with deep pockets. He stated the settlement demand for the *Brockington* case was $25 million before the first and second trials.

The expert witness described the horrific nature of the injuries at issue in the *Brockington* case, which involved seven plaintiffs. The severe nature of the plaintiffs' injuries included burns to the face and upper torso and legs; the insertion of a metal plate to repair musculoskeletal injuries; temporary blindness and paralysis; a traumatic brain injury; and neck, spine, and knee surgeries.

The jury's decision was supported by evidence and bore a reasonable relationship to the damages proved. As already noted, ConAgra did not actually specify to the jury the amount to award for the *Brockington* settlement. We cannot conclude that the jury's verdict was contrary to all reason, and we therefore decline to alter the amount of damages awarded.

## V. CONCLUSION

For the reasons set forth herein, we find no merit to ConAgra's assignments of errors and affirm the judgment of the district court.

AFFIRMED.

KELCH, J., not participating in the decision.
WRIGHT, J., not participating.