IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

AMERICAN EXPRESS BANK V. CRAIG

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

AMERICAN EXPRESS BANK, FSB, APPELLEE,

V.

STEVE CRAIG, APPELLANT, AND CRAIG CORPORATION, APPELLEE.

Filed March 12, 2019.    No. A-18-002.

Appeal from the District Court for Adams County: STEPHEN R. ILLINGWORTH, Judge. Affirmed.

Patrick M. Heng, of Waite, McWha & Heng, for appellant.

Sara E. Bauer and Shawn D. Flint, of Gurstel Law Firm, P.C., for appellee American Express Bank.

PIRTLE, ARTERBURN, and WELCH, Judges.

WELCH, Judge.

### INTRODUCTION

Steve Craig appeals from a jury verdict finding for American Express Bank, FSB (AMEX) and against both Craig personally and Craig Corporation, in the amount of $166,133.30 in credit card debt incurred by Craig Corporation. Craig Corporation has not appealed from the judgment, but Craig has timely appealed, arguing he should not be personally liable for Craig Corporation's account balance. Having considered and rejected Craig's assigned errors, we affirm.

### STATEMENT OF FACTS

In 1998, Craig applied for a small business credit card account for Craig Corporation with AMEX. The application was granted with Craig as a cardmember and Craig Corporation as the company name. Craig Corporation used the AMEX credit card up through 2014. That same year,

a dispute arose governing the proper balance on the account. AMEX filed a complaint against Craig and Craig Corporation relating to $166,133.30 in unpaid credit card charges. A jury trial was held in September 2017.

AMEX assistant custodian of records Raquel Hernandez testified that as of trial, there was no longer a record of Craig's signed, written application because the records had been destroyed during the normal course of business. According to Hernandez, signed applications for business accounts are only required by federal regulations to be maintained for 12 months. Hernandez also testified that, in the normal course of AMEX's business, they update Cardmember Agreements which changes have to be provided to the cardmembers. As it relates to this case, Hernandez testified that AMEX updated the Cardmember Agreements in 2011. Hernandez testified that "[o]n the Cardmember agreement, only the primary account holder is listed, and that is the individual who applied for the account and is personally liable for it." Hernandez further testified that both the individual and the company are jointly and severally liable for charges incurred on the small business credit card. Hernandez testified that if a Cardmember objects to the terms of an updated Cardmember Agreement, the member has the option of cancelling their account.

A copy of the 2011 updated Cardmember Agreement, which was sent to Craig Corporation and to Craig as the Cardmember, was offered and received as an exhibit at trial. The 2011 Cardmember Agreement provided to Craig Corporation and Craig as the Cardmember, set forth in relevant part:

**Company Name:** CRAIG CORPORATION
**Cardmember Name:** STEVE CRAIG

. . . .

**About your Cardmember Agreement**

This document together with Part 1 make up the Cardmember Agreement *(Agreement)* for the *Account* identified on page 1 of Part 1. Any supplements or amendments are also part of the Agreement.

When you or an Additional Cardmember, as defined below, use the Account (or sign or keep a card), you and the Additional Cardmember agree to the terms of the Agreement.

**Words we use in the Agreement**

*We*, *us*, and *our* mean the issuer shown on page 1 of Part 1. Except as provided below, *Basic Cardmember* means the person who applied for this Account or to whom we address billing statements. *Company* means the business for which the Account is established. *You* and *your* mean the Basic Cardmember and the Company. You agree, jointly and severally, to be bound by the terms of this Agreement.

. . . .

**Replacement Basic Cardmember**

You must tell us if the Basic Cardmember is no longer an employee or officer of the Company or does not want to be the Basic Cardmember. In that case, you must either close the Account, or propose another person to replace the Basic Cardmember.

If you propose another person to replace the Basic Cardmember, that person must agree to assume the obligations and liabilities of the Basic Cardmember under this

Agreement, as of the date that such person replaces the Basic Cardmember. That person is subject to our approval.

You agree that the Basic Cardmember remains the Basic Cardmember until we approve a replacement or the Account is closed.

. . . .

**Promise to pay**

You promise to pay all charges, including:
• charges you make, even if you do not present your card or sign for the transaction,
• charges that other people make, whether or not you or an Additional Cardmember intend to let them use the Account, subject to applicable law, and
• charges that Additional Cardmembers make or permit others to make.

Additional Cardmembers agree to be personally liable for charges made using their card. We may seek payment from them for charges made on their card if neither the Company nor the Basic Cardmember pay us.

In his testimony, Craig admitted he signed the AMEX credit card application but no longer had a copy of the document. He also testified that he signed the application "under Craig Corporation, by me as president, because I was president of the corporation." Craig admitted that AMEX sent him monthly statements to his home address and that he was using the card in 2011. Further, Craig does not dispute that AMEX sent him the updated terms and that, when someone uses a credit card account, they are generally agreeing to the terms of that account. When asked "you did use the account for the $167,000, correct?" Craig responded "Yes" and he did not dispute that he and Craig Corporation failed to pay the bill. Craig testified that he never signed anything that indicated that he was personally liable for the debts of Craig Corporation and that he believes that he is not personally liable for the credit card debt. Craig admitted "I incurred those charges, but . . . I didn't pay the card or the balance because I thought I was . . . being treated completely unfairly based on the situations."

The jury entered a verdict in favor of AMEX against both Craig and Craig Corporation in the amount of $166,131.08, and the court entered judgment in conformity therewith.

ASSIGNMENTS OF ERROR

On appeal, Craig's assignments of error, consolidated and restated, are: (1) the jury verdict was not supported by the evidence; (2) the court erred in finding that the contract created personal liability for Craig; and (3) the court erred in denying his motions including his motion for a directed verdict, motion for judgment notwithstanding the verdict, and motion for a new trial.

STANDARD OF REVIEW

A jury verdict may not be set aside unless clearly wrong, and it is sufficient if there is competent evidence presented to the jury upon which it could find for the successful party. *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018). When reviewing a jury verdict, the appellate court considers the evidence and resolves evidentiary conflicts in favor of the successful party. *Id*.

Contract interpretation presents a question of law. *Id*. Appellate courts independently review questions of law decided by a lower court. *Cano v. Walker*, 297 Neb. 580, 901 N.W.2d 251 (2017).

In reviewing rulings on motions for directed verdict and judgments notwithstanding the verdict, an appellate court gives the nonmoving party the benefit of all evidence and reasonable inferences in his or her favor, and the question is whether a party is entitled to judgment as a matter of law. *First Express Servs. Group v. Easter*, 286 Neb. 912, 840 N.W.2d 465 (2013). Regarding motions for new trial, an appellate court will uphold a trial court's ruling on such a motion absent an abuse of discretion. *Id*.

ANALYSIS

JURY VERDICT NOT SUPPORTED BY EVIDENCE

Craig argues that there was insufficient evidence to support the jury's verdict that Craig agreed to be personally responsible for Craig Corporation's debt. Specifically, Craig argues:

While the Craig Corporation had separate arguments it made regarding the indebtedness, the jury found against it. However, as it pertains to . . . Craig, American Express never produced any evidence as to when or where . . . Craig ever modified his position that he was the cardholder in any capacity other than as President of the Craig Corporation.

Brief for appellant at 12. We disagree.

In general, a determination of whether a contract exists is a question of fact. *Braunger Foods v. Sears*, 286 Neb. 29, 834 N.W.2d 779 (2013). Accordingly, we must first determine whether there was sufficient evidence in the record to support the jury's factual finding that there was an agreement between AMEX and Craig personally.

Hernandez testified that Craig Corporation became an account holder in 1998 but that AMEX could not produce a copy of the 1998 application agreement. Craig testified that he did execute the original application but also did not retain a copy. Hernandez testified that this particular account, opened in 1998, was a small business owners' account which required that both the business and business owner were jointly and severally liable for account balances. Hernandez distinguished this type of small business account from a corporation account where only the corporation was liable. Craig testified that he remembered signing the application for the account, but believed he signed it only on behalf of the company and not on behalf of himself individually.

Regardless of the language of the original 1998 Cardmember Agreement, Hernandez testified that AMEX sent an updated Cardmember Agreement to all small business account holders in 2011. In response to being asked whether he received the 2011 updated Cardmember Agreement, Craig testified, "Well, I don't remember it, but I'm sure we probably did." In addition to other language quoted in the facts section of this opinion, the updated Cardmember Agreement provided that it became effective upon use of the account and that by using the account, "you . . . agree to the terms of the Agreement." The updated Cardmember Agreement additionally defined "You" and "Your" to mean the "Basic Cardmember" and the "Company." Part 1 of the Cardmember Agreement listed the Cardmember as "STEVEN CRAIG" and the Company as "CRAIG CORPORATION." Craig testified to using the account after the date the 2011 updated

Cardmember Agreement was issued. In fact, the entire account balance for which AMEX brought suit was accrued after the 2011 updated Cardmember Agreement was issued.

Specifically, the updated Cardmember Agreement provided that "You [previously defined as the Cardmember and Company] agree, jointly and severally, to be bound by the terms of the Agreement." Further, the updated Cardmember Agreement also provided that "You promise to pay all charges" and that a Basic Cardmember must remain liable unless and until a replacement Basic Cardmember agrees to "assume the obligations and liabilities of the Basic Cardmember under the Agreement."

In short, there was ample evidence in the record for the jury to conclude that Craig was provided with an updated Cardmember Agreement in 2011, that the terms of the updated Cardmember Agreement contemplated acceptance of the terms by subsequent use of the account, that there was subsequent use of the card, and that, as discussed in more detail below, the updated Cardmember Agreement obligated Craig to pay for all account charges and remain jointly and severally liable to all terms, including payment terms. Because there was competent evidence in the record to support the factual finding by the jury that Craig did agree to the terms of the 2011 updated Cardmember Agreement, we will not set aside the verdict on the basis of there being insufficient evidence to support the verdict. See *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018). We hold there was sufficient evidence in the record to establish that Craig agreed to the terms set forth in the updated 2011 Cardmember Agreement.

### CONTRACT ESTABLISHES PERSONAL LIABILITY OF CRAIG

Craig next argues that he never agreed to be personally liable for the account in 1998, that AMEX could not produce evidence to the contrary from the 1998 transaction, that he never consented to the modification of the contract in 2011, and that the language of the updated 2011 Cardmember Agreement does not consist of language which renders him personally obligated on the corporate debt. We discuss these arguments independently.

Craig first argues that there is no evidence that he agreed to be personally obligated on this AMEX account in 1998. This is really a restatement of his first assignment of error. Hernandez testified that the particular account Craig initiated in 1998 was a small business account. Hernandez testified that, unlike a corporate account, a small business account would have required an individual to be personally liable on the account. Craig testified that he recalled signing the account application only as president of Craig Corporation and not for himself personally. But regardless of the terms of the 1998 Agreement, Hernandez testified that AMEX sent Craig an updated Cardmember Agreement in 2011 which Craig testified he likely received. The updated 2011 Cardmember Agreement clearly and unambiguously provided that use of the account constituted acceptance of the terms and conditions of the Cardmember Agreement. Craig agreed that he likely received the updated Cardmember Agreement and used the account up through 2014. Nevertheless, Craig cites *Solar Motors v. First Nat. Bank of Chadron*, 249 Neb. 758, 768, 545 N.W.2d 714, 721 (1996), which provides "[m]utual assent by the parties is required to modify a contract that substantially changes the liabilities of the parties. Moreover, the silence of a contracting party to a proposed modification leaves the contract unmodified." Craig then argues, "Clearly in the case at bar, there was never any subsequent consent to the modification. As the

- 5 -

Nebraska Supreme Court has indicated, silence by a contracting party to such modification leaves the contract 'unmodified.'" Brief for appellant at 8.

But there is a significant difference between *Solar Motors* and the case at bar. Here, AMEX included in the language of its updated Cardmember Agreement, which Craig testified he likely received, a provision which stated that subsequent use of the account by Craig constituted acceptance of its terms. In addition, the Cardmember Agreement provided that it would be governed by the laws of the State of Utah.

The Nebraska Supreme Court has previously noted:

We have recognized that persons residing in different states may select the law of either state to govern their contract and that the parties' choice of law will govern. [See *Vanice v. Oehm,* 247 Neb. 298, 526 N.W.2d 648 (1995).] This principle is consistent with Restatement (Second) of Conflict of Laws § 187[ at 561 (1971)], which provides:

"(1) The law of the state chosen by the parties to govern their contractual rights and duties will be applied if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue.

"(2) The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

"(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

"(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties."

We adopt § 187. . . .

*American Nat. Bank v. Medved*, 281 Neb. 799, 805-06, 801 N.W.2d 230, 236-37 (2011).

Accordingly, Craig and AMEX were free to select the applicable law governing their agreement and AMEX specifically stated that Utah law shall govern. AMEX then expressly provided that Craig and Craig Corporation could accept the terms of the updated Cardmember Agreement by subsequent use of the card. Utah Code Ann. § 25-5-4 (West 2004) provides, in pertinent part:

(1) The following agreements are void unless the agreement, or some note or memorandum of the agreement, is in writing, signed by the party to be charged with the agreement:

(a) every agreement that by its terms is not to be performed within one year from the making of the agreement;

(b) every promise to answer for the debt, default, or miscarriage of another;

(c) every agreement, promise, or undertaking made upon consideration of marriage, except mutual promises to marry;

(d) every special promise made by an executor or administrator to answer in damages for the liabilities, or to pay the debts, of the testator or intestate out of his own estate;

(e) every agreement authorizing or employing an agent or broker to purchase or sell real estate for compensation; and

(f) every credit agreement.

. . . .

[(2)](e) A credit agreement is binding and enforceable without any signature by the party to be charged if:

(i) the debtor is provided with a written copy of the terms of the agreement;

(ii) the agreement provides that any use of the credit offered shall constitute acceptance of those terms; and

(iii) after the debtor receives the agreement, the debtor, or a person authorized by the debtor, requests funds pursuant to the credit agreement or otherwise uses the credit offered.

As such, under Utah law, an unsigned credit card agreement may be enforced against the user of a credit card who has been provided a written copy of the agreement when the written agreement provides that use shall constitute acceptance and the debtor subsequently does use the credit offered. There was evidence of those elements being met here. Craig was free to reject the updated Cardmember Agreement by discontinuing use of the account but did not do so. By its explicit terms, Craig would accept the terms of the updated 2011 Cardmember Agreement by use of the card and cannot be heard to argue that the record lacks evidence of his assent to its provisions.

Craig next argues that the explicit terms of the updated 2011 Cardmember Agreement did not provide that he was personally obligated on the small business debt. In support of that clam, Craig cites to *In re Gonzalez*, 410 B.R. 868 (Bankr. D. Ariz. 2009). Craig argues that, in *In re Gonzalez*, the bankruptcy court found that similar language contained in an AMEX credit account agreement was found insufficient to bind an individual personally to the small business debt. Conversely, AMEX argues the instant case is more akin to *In re Fairfield*, 455 B.R. 849 (Bankr. E.D. Pa. 2011), in which the bankruptcy court held that similar language contained in an AMEX credit account agreement did render an individual personally liable for the small business debt.

Contract interpretation presents a question of law. *Jacobs Engr. Group v. ConAgra Foods*, 301 Neb. 38, 917 N.W.2d 435 (2018). Appellate courts independently review questions of law decided by a lower court. *Cano v. Walker*, 297 Neb. 580, 901 N.W.2d 251 (2017). After reviewing the language of the updated 2011 Cardmember Agreement and upon applying the applicable Utah statutory law, we find that the language contained within the 2011 updated Cardmember Agreement in this case clearly and unambiguously provided that Craig would be personally obligated on Craig Corporation's debt.

As discussed in the previous section of this opinion, the 2011 updated Cardmember Agreement provided that Craig was the Cardmember and that Craig Corporation was the Company. The Cardmember Agreement defined that when the term "You" was used within the Cardmember Agreement it meant both the Cardmember and the Company. The updated

Cardmember Agreement stated that both the Cardmember and the Company were "jointly and severally, to be bound by the terms of this Agreement," and that both the Cardmember and Company promised to pay all charges incurred under the account. We hold that the language of the Cardmember Agreement did create personal liability for Craig. In doing so, we note that our interpretation of the contract language is in accord with numerous courts which have reached the same or similar conclusion. See, *In re Fairfield, supra*, citing *Eze v. JP Morgan Chase Bank, NA*, Civ. No. 09-2722, 2010 WL 3189813 (E.D.N.Y. Aug. 11, 2010); *In re Garberg,* Bky. No. 05-19589, 2006 WL 1997415 (Bankr. E.D. Pa. Jun. 7, 2006). See, also, *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F. Supp. 2d 641, 647 (N.D. Ohio 2007) ("Cases from other jurisdictions generally have found the individual to be bound by the agreement if the contract includes a clause extending liability to all persons named on the card or to whom the card issuer issued the card. *Baker v. Am. Express Travel Related Servs.,* 2002 WL 1205065, at *2 (W.D.Ky.); *In re Adams,* 2007 WL 1702511, 2007 Bankr.LEXIS 2026, 5-6 (Bankr.D.M.D.Ala.); *Am. Express Travel Related Servs., v. Redner,* 2006 WL 664698, 2006 Mich.App. LEXIS 728, 11 (Ct.App.Mich)").

DENIAL OF MOTIONS

Craig's final assignment of error is that the court erred in denying his motions for directed verdict, judgment notwithstanding the verdict, and motion for a new trial, all on the basis that there was insufficient evidence in the record to support a finding of personal liability on behalf of Craig. Having held that there was sufficient evidence to support a finding of personal liability by Craig, the court did not err in denying the motion for directed verdict and motion for judgment notwithstanding the verdict and did not abuse its discretion in denying Craig's motion for a new trial.

CONCLUSION

Having considered and rejected Craig's assigned errors, we affirm the jury verdict as entered by the district court in conformity therewith.

AFFIRMED.